2005 WY 80

**Patricia MICHAELIS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 04–73.

Supreme Court of Wyoming.

July 15, 2005.

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden (argued), Senior Assistant Appellate Counsel, for Appellant.

Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; Eric Johnson, Director, Prosecution Assistance Program; and Joseph D. Findley (argued), Student Intern, for Appellee.

Before HILL, C.J., and GOLDEN, VOIGT and BURKE, JJ., and KAUTZ, D.J.

HILL, Chief Justice.

[¶ 1] Patricia Michaelis (Michaelis) challenges the sufficiency of the evidence to sustain her conviction for involuntary manslaughter. Upon review of the record, we affirm.

## ISSUE

[¶ 2] The sole issue in this appeal is whether sufficient evidence exists to uphold Michaelis' conviction.

## STANDARD OF REVIEW

[¶ 3] Our recitation of the factual background of this case is set forth within the context of our standard of review. When reviewing sufficiency of the evidence issues, "[w]e assess whether all the evidence presented is adequate to form the basis for an inference of guilt beyond a reasonable doubt to be drawn by a finder of fact when that evidence is viewed in the light most favorable to the State." *Lopez v. State*, 2004 WY 28, ¶ 16, 86 P.3d 851, ¶ 16 (Wyo.2004) (quoting *Estrada–Sanchez v. State*, 2003 WY 45, ¶ 6, 66 P.3d 703, ¶ 6 (Wyo.2003)).

We leave out of consideration the evidence presented by the unsuccessful party which conflicts with the successful party's evidence and afford every favorable inference to the successful party's evidence which may be reasonably and fairly drawn from that evidence. Even though it is possible to draw other inferences from the evidence presented, the jury has the responsibility to resolve conflicts in the evidence. We will not substitute our judgment for that of the jury when we are applying this rule; our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did.

*Id.*

## FACTS

[¶ 4] Michaelis gave birth to a daughter, Aubrey, six weeks prematurely on December 24, 2002. Close to midnight on March 5, 2003, Michaelis put Aubrey to bed using two electric blankets, one red and one green. Michaelis had gotten the blankets from her mother, Patsy Michaelis (Patsy) who had used the blankets with her own children. Patsy knew that the red blanket got hot, "like it was malfunctioning or something."

Michaelis was aware that the controller on the red blanket was "very touchy" and moved easily from a low temperature to a high one.

[¶ 5] On the morning of March 6, Michaelis missed an appointment and failed to respond to knocks on her apartment door or phone calls. Patsy let herself in and found Michaelis sleeping in the bedroom with a blanket over the window and Aubrey beside her. It was too dark for Patsy to see, so Michaelis got up and removed the blanket from the window. Patsy could observe a purplish color to Aubrey's face and when Michaelis picked her up, she could see that the purplish color ran down the child's back. Patsy said, "Oh, my God, I think she's dead, I'm calling 911." While Patsy called 911, Michaelis began administering CPR on Aubrey.

[¶ 6] The police and emergency personnel quickly responded, and Aubrey was transported to the hospital. Aubrey, however, was "obviously lifeless," and resuscitation efforts ended shortly after her arrival. An examination of Aubrey's body revealed spots on her forehead and back that appeared to have been blisters that had burst. It was not possible, however, to determine whether the spots were caused by thermal blistering or sloughing of the skin due to decomposition. The discoloration on Aubrey's back was lividity, which was where the blood pooled after it was no longer circulating. Aubrey also had long, linear white pressure marks on her back as if something had been pressed against her body inhibiting the blood from pooling there. Fibers from the red electric blanket were found in her hands and mouth. An autopsy determined that the cause of death was hyperthermia.

[¶ 7] The police officer and emergency personnel who observed Michaelis at her apartment and at the hospital considered her behavior unusual. Michaelis was described as "flat," "unemotional," and "easily agitated and irritable." She had difficulty understanding instructions, and her conversations were fragmented. A police officer believed that Michaelis seemed to be more worried about brushing her hair and finding her shoes than getting to the hospital. A nurse felt that Michaelis appeared angrier about the situation than distraught. That witness believed that Michaelis behaved like someone on amphetamines.

[¶ 8] While at the hospital, Michaelis acceded to a request from the police for blood and urine samples. The blood draw was negative but the urine sample returned positive for marijuana and methamphetamine. Later at trial, the State offered the testimony of Duwayne Skansberg, an addictions therapist with experience treating methamphetamine addicts. Skansberg testified that methamphetamine is a highly addictive drug that causes an extreme high or rush. He noted that a tolerance is built up to the drug that requires a user to consume more and more of it to attain the high. He stated that the tolerance is built up quickly. Skansberg testified that when the high or rush starts to wear off, a user "crashes." When crashing, methamphetamine users display symptoms characteristic of paranoid schizophrenics, and they will take steps to avoid being observed, such as nailing blankets over windows. He also noted that people crashing from a methamphetamine high would be easily agitated and irritated and have trouble staying on topic and maintaining a conversation. According to Skansberg, experienced users of methamphetamine are well aware of the effects of a "crash" and will take alcohol and marijuana to cushion its effects. He opined that novice users usually do not mix drugs. Ultimately, Skansberg testified that a "crash" induces an exhaustive sleep from which it is difficult to awaken the person.

[¶ 9] The electric blankets were sent to the Wyoming State Crime Laboratory for testing. A series of experiments were conducted using the blankets with a two-liter plastic bottle that was filled with water at human body temperature. In one scenario, the bottle was placed on top of the green blanket with the red blanket draped loosely over the bottle. The controller on the green blanket was set on medium while the controller on the red blanket was set on high. The temperature in the bottle rose to 105–106 degrees in an eight-hour period. In the second scenario, the red blanket was wrapped around the bottle with the temperature con-

trol set on medium. The temperature inside the bottle reached 108 degrees within two hours. After eight hours, the bottle's temperature was 138 degrees. The red blanket got warm to the touch but never hot enough to burn.

[¶ 10] Michaelis was charged with involuntary manslaughter in violation of Wyo. Stat. Ann. § 6-2-105(a)(ii) and (b) (LexisNexis 2005)[1] for the death of her daughter, Aubrey. At trial, the State's theory was that Michaelis wrapped Aubrey in an overheating electric blanket while Michaelis entered into a methamphetamine "crash" induced exhaustive sleep rendering her incapable of responding to her child's struggles as the blanket caused the child's temperature to rise to the point where death was caused by hyperthermia.

[¶ 11] Michaelis countered that Aubrey's death was a tragic accident. The conclusion that hyperthermia was the cause of death was attacked in cross-examination of the medical examiner and the attending emergency room physician by attempting to establish the possibility that Aubrey died of Sudden Infant Death Syndrome (SIDS). Michaelis and her mother testified at trial that Aubrey was not wrapped in the red electric blanket; they claimed that Aubrey was laid on top of the green electric blanket, and that the red one was then draped over her, like a sheet. Michaelis admitted to smoking marijuana two days before Aubrey's death but denied ever using methamphetamine.

[¶ 12] The jury was instructed on the involuntary manslaughter charge and the less-

er-included charge of criminally negligent homicide.[2] After deliberations, the jury returned a verdict of guilty on the involuntary manslaughter charge. Michaelis was subsequently sentenced to a term in the penitentiary of not less than 10 years and not more than 15 years. Additional facts will be set forth as necessary in the discussion that follows.

## DISCUSSION

[¶ 13] The jury was given the following instruction regarding the elements of the crime of involuntary manslaughter, Wyo. Stat. Ann. § 6-2-105(a)(ii):

> The elements of the crime of Manslaughter, as charged in this case are:
> 1. That Defendant, Patricia Michaelis;
> 2. On or about March 6, 2003;
> 3. In Carbon County, State of Wyoming;
> 4. Unlawfully killed Aubrey Michaelis;
> 5. Involuntarily, but;
> 6. Recklessly.

Michaelis argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that she unlawfully killed Aubrey Michaelis or that she acted recklessly.

### Cause of Death

[¶ 14] In challenging the sufficiency of the evidence that she unlawfully killed Aubrey, Michaelis contends that the State failed to prove beyond a reasonable doubt that the cause of death was hyperthermia. Specifical-

---

1. Wyo. Stat. Ann. § 6-2-105 provides in relevant part:
 (a) A person is guilty of manslaughter if he unlawfully kills any human being without malice expressed or implied[.]
 . . . .
 (ii) Involuntarily, but recklessly. . . .
 (b) Manslaughter is a felony punishable by imprisonment in the penitentiary for not more than twenty (20) years.

2. Wyo. Stat. Ann. § 6-2-107 (LexisNexis 2005) provides:
 (a) Except under circumstances constituting a violation of W.S. 6-2-106, a person is guilty of criminally negligent homicide if he causes the death of another person by conduct amounting to criminal negligence.

(b) Criminally negligent homicide is a misdemeanor punishable by imprisonment for not more than one (1) year, a fine of not more than two thousand dollars ($2,000.00), or both.

The jury was instructed that "criminal negligence" was defined as the following conduct: A person acts with criminal negligence when, through a gross deviation from the standard of care that a reasonable person would exercise, she fails to perceive a substantial and unjustifiable risk that the harm she is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

ly, Michaelis argues that SIDS was not conclusively eliminated as a potential cause of death. Michaelis claims that the State's expert medical witnesses agreed that SIDS might have been the cause of death. Since SIDS could not be ruled out as a cause of death, Michaelis argues that the State's evidence fell well short of what was needed to prove beyond a reasonable doubt its theory that Aubrey died of hyperthermia.

[¶ 15] The State sought to establish the cause of death as hyperthermia through the testimony of Dr. Stephen Cina, a medical examiner who performed the autopsy on Aubrey, and Dr. Duane Abels, the attending physician when Aubrey was brought into the emergency room on March 6, 2003. On direct examination, Dr. Cina testified as follows:

Q: Starting at the upper body cavities, the cardiovascular system, did you find anything abnormal there?

A: No. The heart and the big vessels seemed to be in the normal hematonic relationships. Looking at the lungs and thymus, which is an organism in the mid part of the chest, there were little pinpoint hemorrhages on the surfaces of the lungs and on the thymus, which is the only remarkable finding.

Q: What is that finding indicative of?

A: It's really controversial. It's a very common finding in the Sudden Infant Death Syndrome. Some people say that it's related to terminal stress, others aren't sure why it happens. It doesn't kill you, it's just something that we see sometimes. I've seen in it [sic] clinic cases of Sudden Infant Death, but I've seen cases of Sudden Infant Death that do not have petechiae. I've seen kids that have been in trauma and infected that have petechiae. **In this case, which was hyperthermia, this kid had great petechiae, but it's not indicative of Sudden Infant Death Syndrome.** So it's just something that you make note of. If you see it, you write it. **If it is Sudden Infant Death Syndrome, it's supportive evidence, but it's not diagnostic in and of itself.**

. . . .

Q: You say it is not indicative in this case of Sudden Infant Death Syndrome. Why do you say that?

A: The definition of Sudden Infant Death Syndrome involves complete autopsy, including microscopic analysis, looking at all of the organs, a toxicological analysis, blood cultures, and correlating all of this for the circumstances of death. · **In this case, clearly the kid had a body temperature of 108 degrees very close to the time of discovery. With a circumstance like that, there is no way I could call this a sudden infant death.** [Emphasis added.]

In cross-examination, defense counsel focused on the possibility of SIDS as a cause of death:

Q: I want to first start with your report here. And I guess the thing that stuck out to me is that you had found some anatomical findings of SIDS, and you had explained that that was some puncture wounds—or not wounds but punctures in the lungs; is that correct?

A: As I said, they are not specific findings that you see in SIDS cases, which are pinpoint hemorrhages on the thymus and the surface of the lungs. **They're not diagnostic of SIDS, but it's a common finding in SIDS.**

Q: Is this the only information that you have that relates to a possible SIDS diagnosis?

A: There are other circumstances that support a diagnosis of SIDS. The vast majority of children who die of Sudden Infant Death Syndrome are found face down, often in a type of blanket or pillow that allows rebreathing of exhaled air. And I have no evidence that that was the case in this scenario.

Q: Okay. Now, it's true that there are some babies laying on their back that have died of SIDS?

A: That's true. SIDS is actually a collection of several diseases which medicine has not yet split apart. So certainly, some of these subtypes could die on their back, but most die face down.

Q: Okay. I was on the National Association of Pediatrics web site, and I was looking at their site about SIDS. They indicate,

and tell me if this is true, that most SIDS cases occur in the winter time?

A: More than the usual number happen in the winter time.

Q: Okay. And they also indicate that one of the factors that they found common among SIDS was overheating?

A: I'm not aware of that being a risk factor. **To me, overheating would be exclusionary of SIDS, according to the pathology literature.**

Q: Okay. But the pediatric—Would you agree that the pediatrics may have made that conclusion?

A: I don't see actually how pediatricians could say that overheating was a part of the diagnosis of SIDS. The medical examiner community and the other communities have had some major disagreement with some of the pediatric stance in this area.

Q: We are not talking necessarily about hyperthermia, but over placing the child in more blankets than necessary, sleepers and stuff like that that may not be necessary under the normal room temperatures.

A: Well, if you're talking about the fact that these kids who die of SIDS are often in heavy blankets or those thick nylon fluffy kind of comforters, I don't think that's an overheating mechanism, those things tend to trap carbon dioxide as kids exhale and then the kids tend to rebreathe that. So if you're talk [sic] about the type of bedding used, there tends to be heavier types of bedding in SIDS cases, but it's a breathing rather than a heating cause.

Q: That's what you, as a pathologist, agree with, not necessarily what the pediatricians agree with, correct?

A: Even most pediatricians, including the ones at UCSD who have done a lot of research, think rebreathing is a factor in SIDS.

Q: No, they don't. I mean, the pediatrician site says that, but they also include the overheating, making the baby too warm.

A: Once again, to me that would be exclusionary to most of the people who I've trained with. **If there is a significant component, more than a degree or two, I think I would have to exclude SIDS.**

Q: Okay. Now, with the—It's possible that this baby died of SIDS?

A: **Well, it would be theoretically possible that the kid died of SIDS if these circumstances, as reported to me, are untrue.** [Emphasis added.]

In her brief, Michaelis points to several aspects of the State's medical experts' testimony that she claims undermines their opinions on causation. Specifically, she points to the marks on Aubrey's skin and argues that the experts' inability to determine whether they were blisters caused by a thermal source or sloughing of the skin due to accelerated decomposition meant that they could not eliminate the possibility that Aubrey died of SIDS and then had her internal body temperature raised to the level of her surrounding environment—i.e., the temperature of the electric blanket that was draped over her body. Dr. Cina discussed both of these points during cross:

Q: So the evidence that was given to you was that the baby had reached 108 degrees, that the baby was wrapped in an electric blanket?

A: That's correct.

Q: Okay. And is that the only thing that you based your—or accelerated decomposition?

A: **Accelerated decomposition fit with those circumstances in that excessive heating will accelerate decomposition. So it did explain that finding.**

Q: Making the assumption that the baby may have died of SIDS, could the baby be heated up to a temperature of 108?

A: A body will go to whatever the impeding temperature is around it. Usually that involves cooling of the body. But if you die in the desert in Arizona, your body is going to go up to 110 or 115, whatever the temperature is around you. If this child died in a 74 degree room exposed to air, the child would be 74 degrees. If this child was in an open environment that's 110 degrees, eventually the body temperature would go to 110 degrees.

Q: Okay. And if the electric blanket, as has been indicated by that report that you received from the crime lab, had been laying over the baby and it dies of SIDS, would the temperature raise [sic] to meet the temperature of the electric blanket?

A: It wouldn't necessarily meet the temperature of the electric blanket. I think experimental data would have to show just how hot laying [sic] a blanket might get on an area could make that local environment. We've seen some of Mr. Crivello's [of the Wyoming State Crime Laboratory] data that laying a blanket on a bottle doesn't significantly raise the temperature, putting a bottle on top of a blanket doesn't really raise the temperature, but wrapping a blanket around the water bottle will raise the temperature.

Q: I want to show a copy of Mr. Crivello's report—a page of it, rather. That portion of the experiment was done with the red blanket laying on top of the bottle; is that correct?

A: That's correct.

Q: And what was the ultimate temperature on the external?

A: The external eventually reached 42.5 degrees Celsius.

Q: And that would be what, about 108 degrees, would it not?

A: 108 and a half. But this took eight hours to reach that temperature. **So it was a very, very, very slow incline.**

Q: But if the baby had died and stuff, there would be no resistance with the baby to try to control the outside elements. Like we would sweat, correct, to try to control overheating?

A: Yes. We have physiological mechanisms, such as sweating, and brain controls and dilation of your blood vessels would not be in effect. **However, the resistance of skin and the fat surrounding the baby would be in effect still. So it would take a while to heat up a baby.** [Emphasis added.]

Thus, Dr. Cina concluded that the marks on Aubrey's body were consistent with hyperthermia regardless of whether or not they were evidence of blisters and/or accelerated de-

composition since both require the presence of an outside thermal source. Based upon the testing done on the blankets at the Wyoming State Crime Laboratory, Dr. Cina discounted Michaelis' theory that the blanket raised Aubrey's body temperature after her death because there simply was not enough time for the blanket to reach that temperature if it had been draped over Aubrey's body as Michaelis contended. Contrary to Michaelis' representations, Dr. Cina opined that SIDS could not have been the cause of death under the circumstances of this case. Dr. Cina allowed SIDS as a possibility only in response to theoretical questions from defense counsel that stripped away the context of Aubrey's death. The testimony of Dr. Abels parallels that offered by Dr. Cina. Recognizing this, Michaelis attacks the evidence of the circumstances relied upon by the State's medical experts in the formation of their opinions that the cause of death was hyperthermia: the temperature reading of 108 degrees taken from Aubrey's body at the emergency room, the validity of the testing on the electric blankets by the Wyoming State Crime Laboratory, and the contention that Aubrey was "wrapped" in the red electric blanket. Michaelis argues that the evidence underlying each of these was unreliable, and that Drs. Cina's and Abels' reliance upon them as the basis for their opinions on the causation of Aubrey's death rendered those opinions unreliable to an extent that a reasonable doubt as to the cause of death was raised.

[¶ 16] First, Michaelis takes issue with the testimony of Kathleen Karczewski, an EMT who took the temperature reading of 108 degrees from Aubrey's body after she had been declared dead at the hospital. On cross-examination, Karczewski admitted that she did not know the accuracy of the digital thermometer that was used. She acknowledged that digital thermometers might have inherent inaccuracies in them and that they would have to be serviced at times to ensure accuracy. Karczewski did not know the service history of the thermometer she used. Michaelis argues that this testimony renders the temperature reading unreliable.

[¶ 17] Our review of the record shows the following: Officer Travis King testified that when he collected the red electric blanket, it "seemed extremely warm" and that after handling it, he noticed that his latex gloves had been scorched to the point that they turned brown; Officer King noted that the controls of both blankets were set on "high;" everyone who handled Aubrey's body that morning noted that it felt very warm; and the marks on Aubrey's body—whether blisters or sloughing—were indicative of a heated environment around the child. The inference could be drawn from the circumstantial evidence that the thermometer's reading was reasonably accurate. Furthermore, the testimony of Drs. Cina and Abels makes it clear that their opinions were not based on the 108–degree reading per se. Dr. Cina noted that he would have excluded SIDS as a cause of death if the child's temperature reading had been "a degree or two" above normal. Similarly, Dr. Abels expanded on this point:

> SIDS deaths are often determined by the fact you have cardio pulmonary arrest for reasons unknown. I have attended several SIDS deaths, less now since parents put their kids in the right position and other things to reduce the risk of SIDS deaths, I see a lot less than I used to. But the SIDS deaths I have seen before have all been very cold patients. Their temperatures were never above average, in fact, most of them were well below average.
>
> . . . .
>
> My clinical diagnosis, based on my examination, was with the elevated core temperature, the accelerated smell of decomposition compared . to the time frames that were reported to me when the baby was fed at 4:00 a.m. Father told me he heard the baby crying in the background at 10:30 p.m.
>
> That decomposition did not make any sense in those time frames. That's why I felt the death was due to hyperthermia.

It was not the 108–degree temperature itself that underlay the experts' opinions on causation; rather, it was the overheating of Aubrey in general.

[¶ 18] Next, Michaelis complains about the tests done on the electric blankets at the Wyoming State Crime Laboratory by Richard L. Crivello. She questions the reliability of the test results given that there was no check of the blankets' controls to determine if they were functioning properly. Michaelis claims that Crivello's testimony regarding whether the red electric blanket could have caused Aubrey's death was "rather confusing and contradictory." Our review of Crivello's testimony does not comport with Michaelis' claim.

[¶ 19] In order to test the blankets' capacity to convey heat, Crivello filled a two-liter plastic bottle with water. A stopper was placed in the opening with a thermometer attached so that it was suspended in the middle of the bottle. Two experiments relevant to the factual situation at issue in this case were conducted. In the first, the bottle was wrapped in the red blanket and laid on top .of the green. Both blankets had the controls set on "5" or medium. After eight hours, the temperature in the bottle was 138 degrees and still rising. Crivello acknowledged that water absorbs heat easier than the human body, which meant that the experiment showed that being wrapped in the red electric blanket for eight hours on the high temperature setting would result in an equivalent temperature of 124 degrees in a baby. In the second experiment, Crivello laid the bottle on top of the green blanket and then draped the red blanket over the bottle. The green blanket was left on medium while the red blanket was set on high. The temperature in the bottle rose to 105 to 106 degrees in eight hours. Crivello testified that he monitored the controls to ensure that they remained on the same temperature settings throughout the test. He also stated that he checked the controllers for frayed cords or other signs of defects and did not observe any.

▮ [¶ 20] We find nothing "confusing or contradictory" about Crivello's testimony. Undeniably, the import of the testimony supports the State's theory of the case that hyperthermia was induced by Michaelis wrapping the red blanket around Aubrey. Michaelis' argument on this point is properly characterized as a challenge to the weight and credibility that should have been as-

signed to it. That function, however, is one for the jury, not us. *Daniel v. State,* 2003 WY 132, ¶ 23, 78 P.3d 205, ¶ 23 (Wyo.2003).

[¶ 21] Finally, Michaelis contends that there was no evidence that Aubrey was wrapped in the red electric blanket. At trial, Michaelis and her mother Patsy testified that the red blanket had been laid on top of Aubrey "like a sheet." Michaelis argues that since they were the only eyewitnesses and that there was no other evidence to contradict them, their testimony must be accepted as definitive. Michaelis concludes that the State failed to prove that she wrapped Aubrey in the red electric blanket. Without such proof, Michaelis contends that the State's experts could not establish hyperthermia as the cause of death beyond a reasonable doubt.

[¶ 22] Our review of the record shows that there is sufficient circumstantial evidence upon which the jury could conclude that Michaelis wrapped Aubrey in the red electric blanket. While Michaelis and Patsy did testify that the red electric blanket was draped over Aubrey like a sheet, there are contradictions in their testimony that call into question their credibility. Both Michaelis and Patsy used the term "wrapped" when describing the scene at the time Aubrey's body was discovered before correcting themselves to indicate that the blanket was draped. Michaelis granted an interview with the police the day after Aubrey's death wherein she stated the following:

A: She was covered a little bit. I mean, kinda loosely covered, and I thought that was kind of odd so I put the blanket over, I unwrapped it.

Q: What blanket?

A: The red electric blanket.

Q: She was wrapped in it?

A: Well, it was loosely over, you know, just like you lay a sheet over.

Patsy gave similarly contradictory testimony at trial:

Q: And could you see the rest of Aubrey?

A: No. She was wrapped over with a blanket, and she had a diaper on.[3]

. . . .

Q: You indicated today that the baby was partially covered; is that correct?

A: I call it wrapped the blanket. It was like this, over like this. This part was not wrapped, it was just over—from here down.

Q: From like the stomach down?

A: Yes.

. . . .

Q: Okay. So I want to get the facts straight. In the report it says the baby wasn't covered, but on your examination here today you said the baby was partially covered?

A: [Michaelis] was laying on the bed like this, Aubrey was laying like this up next to her, and the blanket was like this. It was folded from the bottom. It was over and over real loosely, and Aubrey's upper part was able to be seen.

Detective Troy Palmer testified that Patsy told him at one point that Aubrey "may have been wrapped in that blanket." It was the jury's prerogative to weigh this testimony and determine what, if any, credibility should be given to it. *Belden v. State,* 2003 WY 89, ¶ 19, 73 P.3d 1041, ¶ 19 (Wyo.2003).

[¶ 23] Furthermore, Michaelis' claim that the blanket was "draped" over Aubrey cannot account for the heating of her body. According to Michaelis, Aubrey had a feeding at 4 a.m. on March 6, and she was then put back to bed at 5 a.m. Aubrey's body was discovered about 11 a.m. The tests by the Crime Lab demonstrated that draping the blankets over a water bottle would result in a temperature of 105 to 106 degrees after eight hours. The evidence showed that a human absorbs heat at a slower rate than water so the temperature of a body under those conditions would be even lower than that. There simply was not enough time under the conditions alleged by Michaelis to account for the heating of Aubrey's body that was observed

**3.** Patsy testified that she could see that Aubrey was in a diaper as she lay in the blanket. However, emergency personnel testified that she was

in a sleeper. Photographs taken at the emergency room show Aubrey lying on a sleeper. This discrepancy was not explored at trial.

only approximately six hours after she was last seen alive according to Michaelis.

[¶ 24] Only in the scenario in which Aubrey was wrapped in the red electric blanket is the heating of her body adequately explained. It would also account for the marks on Aubrey's body whether they were caused by thermal blistering or sloughing of skin owing to accelerated decomposition associated with high temperatures. In her brief, Michaelis characterizes SIDS as a "quiet death" and claims that there was no evidence of a struggle by Aubrey. Dr. Abels testified that fibers from the red blanket were found in Aubrey's hands and mouth and concluded that for "a child at that age to grasp and pull fibers out would require a great deal of effort on that child's part" beyond the "usual grasp reflex of a child." Considering all of the circumstantial evidence, there was sufficient evidence for the jury to conclude that Aubrey died of hyperthermia and not SIDS.

### Recklessness

[¶ 25] The element of "recklessly" was defined in an instruction to the jury:

> "Recklessly" is defined as the following conduct: A person acts recklessly when she consciously disregards a substantial and unjustifiable risk that the harm she is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constituted a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

Michaelis contends that the State failed to prove that she acted "recklessly," as defined in the cited jury instruction, because it did not prove beyond a reasonable doubt that she "consciously disregarded," as opposed to mistakenly, inadvertently, or subconsciously, "a substantial and unjustifiable risk that the harm she [was] accused of causing [would] occur, and the harm [resulted]." In particular, Michaelis alleges that the State did not prove beyond a reasonable doubt that she knew or was aware that an electric blanket could harm, or even kill, Aubrey. Michaelis argues that the testimony at trial established that she was raised in a household that used electric blankets with infants, including her-

self, and that she had used the same electric blankets on her first two children and had never experienced anything that would cause her to consider them a risk or danger. Michaelis criticizes the testimony of Catherine Harshbarger, the director of nursing at the hospital where Aubrey was born, to the effect that the mothers of all newborns were instructed on safety issues, including a warning not to use electric blankets. She notes that Harshbarger admitted that she had no personal knowledge of whether or not Michaelis had been so instructed during her stay when Aubrey was born. In her testimony, Michaelis denied receiving any such warnings, and so she concludes that Harshbarger's testimony was nothing more than "pure speculation and assumption."

[¶ 26] Michaelis also contends that the State failed to prove beyond a reasonable doubt that she ingested methamphetamine, or if she did, that she ingested so much methamphetamine that she rendered herself incapable of caring for Aubrey or that she was aware that ingesting that amount of methamphetamine would cause that harm and result. As part of her argument, Michaelis launches a two-pronged attack on the test results from the urine sample that was taken from her the day Aubrey died. In her testimony, Michaelis admitted that she had smoked marijuana two days before Aubrey's death; however, she denied consuming any methamphetamine. Michaelis admitted that the marijuana may have been laced without her knowledge but testified that she did not feel any abnormal affects. Additionally, Michaelis suggests that some confusion exists as to whether the urine that was tested was actually hers or someone else's because the tubes containing the urine sample were not properly labeled when the State Crime Lab received them. Michaelis further insists that the questioned urine sample would, at most, establish that she had used methamphetamine once and did not establish that she knew anything about the risks associated with methamphetamine use including the fact that consumption of the drug could cause a "crash" rendering her unable to care for her daughter. Michaelis dismisses the testimony of the State's expert, Duwayne Skansberg,

on the basis that he only testified about generalizations regarding methamphetamine users, which had no application to Michaelis in particular because he had no knowledge of her, her life, behaviors or if she was a drug addict or had ever used drugs before. Michaelis concludes that even if the State had proven that she was a frequent user of methamphetamine that that, by itself, was an insufficient basis from which to infer that she knew of the specific risks associated with the use of the drug.

[¶ 27] We begin with the questions surrounding the urine sample taken from Michaelis. The general rule on chain of custody of evidence is that an object is authenticated "so long as enough testimony is presented to permit a reasonable inference that the object offered is what the proponent claims it to be." *Robinson v. State*, 716 P.2d 364, 369 (Wyo.1986) (quoting 5 D. Louisell & C. Mueller, Federal Evidence § 515 at 88 (1981)). If the party opposing the admission of the evidence claims that it was altered, they must support that charge with something more than speculation. *Robinson*, at *id.; Ostrowski v. State*, 665 P.2d 471, 490 (Wyo.1983). Speculation is all that Michaelis offers. Under the circumstances, it is difficult to see how a urine sample belonging to another person could have been substituted for Michaelis' sample. An EMT accompanied Michaelis into the restroom while Harshbarger and Palmer stood outside the door. After the sample was taken, it was handed over to Harshbarger who gave it to Palmer. In the presence of Harshbarger, Palmer placed the urine sample in the same box as the blood sample and sealed the box. Michaelis does not dispute that the blood sample is hers and the urine sample had the same serial numbers on it as the blood sample. The crime lab technician who tested the samples testified that the box arrived at the lab sealed and that he confirmed the serial numbers on the samples. The jury could reasonably infer that the urine sample was Michaelis'.

[¶ 28] We cannot agree with Michaelis' characterization of the testimony of the State's expert Duwayne Skansberg as irrelevant and unhelpful. In addition to the generalizations regarding methamphetamine and user behavior noted above in our factual recitation, Skansberg also testified regarding specifics related to this case. He noted that Michaelis' urine sample contained 5,553.1 nanograms of methamphetamine per milliliter, which he described as "extremely high"—the highest, in fact, that he had ever seen. Skansberg opined that such a dosage could be fatal to a novice user. Based on Skansberg's testimony, several inferences could be drawn:

· The extraordinarily high level of methamphetamine in Michaelis' urine is indicative of an experienced user.

· The presence of methamphetamine in the urine but not the blood indicates that Michaelis was coming down off a high— i.e., she was "crashing."

· The presence of marijuana in the urine confirms that Michaelis was an experienced user who knew of the effects of a crash and took a secondary drug to cushion the effects.

· Numerous witnesses described Michaelis on the day Aubrey died as "irritable," "easily agitated," "flat and unemotional" and unable to concentrate and follow instructions or carry on a conversation; behaviors that are consistent with methamphetamine users.

Clearly, there is a basis here for the jury to conclude that Michaelis not only used methamphetamine, but that she was an experienced user who was well aware that her actions in consuming methamphetamine were reckless—Michaelis deliberately placed herself in a condition which she knew could render her unable to properly care for her infant daughter.

[¶ 29] We also do not agree with Michaelis' contention that there was no basis upon which the jury could conclude that she was not consciously aware of any risk associated with the use of electric blankets. Nurse Harshbarger testified that it was the routine practice of the hospital to caution mothers of all new infants of the hazards attendant with the use of electric blankets and that they

were to avoid using them.[4] Michaelis testified that she was not given those warnings. The jury obviously did not find Michaelis to be a credible witness. What is more, Michaelis admitted that she knew that the red electric blanket posed a risk. During her interview with the police, she stated:

> To me [the red electric blanket] gets a little too hot at times. I try to adjust the control to the right body temperature. The knob is very touchy. I've always been leery about it ... I could sweat in that electric blanket.

Michaelis reiterated that she knew the blanket got "very hot" and that its controller was "touchy" so that "you could barely touch it with your finger to move from a low temperature to a high" in her testimony at trial. Despite that knowledge, Michaelis elected to wrap her prematurely born infant in the blanket at a time when she had rendered herself incapable of properly caring for the child due to her drug consumption. Under the circumstances, we have little trouble in concluding that there is sufficient evidence to support the jury's conclusion that Michaelis acted recklessly.

## CONCLUSION

[¶ 30] The record contains sufficient evidence to support Michaelis' conviction for involuntary manslaughter. The judgment and sentence is affirmed.

---

**4.** See Wyoming Rule of Evidence 406, which provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.