2005 WY 146

**Brandon Keith BUTCHER,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

No. 04–208.

Supreme Court of Wyoming.

Nov. 22, 2005.

Representing Appellant: Kenneth Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Marion Yoder, Senior Assistant Public Defender.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, BURKE, JJ.

VOIGT, Justice.

[¶ 1] A jury found the appellant guilty of second-degree murder as a lesser-included offense to the charge of first-degree murder. We affirm the judgment and sentence entered by the district court.

### ISSUES

1. Did the district court err in denying the appellant's motion for judgment of acquittal on the first-degree murder charge?

2. Was there sufficient evidence to sustain the finding of guilt on the lesser-included offense of second-degree murder?

3. Was the jury improperly instructed on the meaning of the word "purposely?"

4. Was cumulative prejudicial "flight" evidence improperly admitted?

5. Did the prosecutor commit misconduct by eliciting irrelevant prejudicial evidence and by making improper argument?

### FACTS

[¶ 2] In the early evening hours of June 17, 2003, John DiIorio accompanied Shawn Kouri and Becky Cavender to The Lounge, a bar in Casper, Wyoming. Cavender went to play dice, while DiIorio and Kouri sat at a nearby table, where they were given two free drinks by the bartender. When DiIorio said he was not feeling well, Kouri took him to a friend's home to get something to eat. Shortly thereafter, they returned to The Lounge to pick up Cavender. As they entered the bar, the appellant stopped Kouri and asked for a ride to a house on Lincoln Street. Kouri agreed, and the appellant got in the back seat of Kouri's car. DiIorio sat in the front passenger seat. The trio proceeded to the Lincoln Street address, but upon seeing two police cars there, they returned to The Lounge.

[¶ 3] Kouri parked in the parking area in front of the bar. The appellant got out of the vehicle and spoke with Kouri through the open window. DiIorio repeatedly asked the appellant what they were talking about, but the appellant ignored him, which upset DiIorio. The appellant calmed DiIorio down and walked away toward the bar. Kouri talked to DiIorio for a few minutes, and then went into the bar to find Cavender, leaving DiIorio sitting in the car.

[¶ 4] Shortly thereafter, the appellant spoke with Jenna Myers, whom he had accompanied to the bar to pick up Ashley Hessler, and asked for the keys to her car. Rather than giving the keys to the appellant, Myers went with him to the car and unlocked the doors. The appellant reached into the back seat area and grabbed his hunting knife, which was in a leather sheath. The appellant tucked the knife into the waistband of his shorts and adjusted his shirt so the knife was not visible.

[¶ 5] Myers locked the car doors and suggested to the appellant that they go back into the bar. The appellant declined the invitation and, instead, asked Myers about the

identity of the man sitting in the front seat of Kouri's car. When Myers identified the man as "John DiIorio," the appellant asked if he was the one who had raped Hessler. Myers confirmed that he was, at which point the appellant said something to the effect that he "should go stab him" or "should stick him." Myers told the appellant not to do anything stupid, and again tried to get him to return to the bar. Once again, the appellant declined.

[¶ 6] Myers left the appellant standing next to her car and went back into the bar. Inside, she told Jeff Maxfield that the appellant was "going to stab somebody." Maxfield ran outside to stop the appellant. As he exited the bar, Maxfield saw the appellant running toward him from Kouri's car and wiping a knife on his shorts. The appellant asked Maxfield to help him get away from the area. When Maxfield refused, the appellant tucked the knife into his shorts and ran toward the bar's lower parking lot.

[¶ 7] Maxfield and other bar patrons ran to Kouri's car, where they found DiIorio slumped over in the driver's seat, with blood on his hands, shirt and pants. They pulled DiIorio out of the car, laid him on the ground, and administered CPR while waiting for an ambulance to arrive. DiIorio was taken to the hospital, where he died of his injuries. An autopsy revealed that DiIorio died of a stab wound, the knife having entered his chest at a steep right to left angle which, coupled with extensive internal injuries, indicated that he was moving away from his attacker when the fatal injury was inflicted.

[¶ 8] The police apprehended the appellant in a Glenrock, Wyoming, park on the night of June 18, 2003. The appellant had changed his appearance and had attempted to garner enough money and other resources to leave the area. He had also disposed of his bloody clothes and the knife with which he had stabbed DiIorio. The knife was never recovered.

[¶ 9] At trial, the appellant admitted stabbing DiIorio, but maintained that he did so in self-defense. According to the appellant, DiIorio was "acting crazy" after they returned to The Lounge from their excursion to Lincoln Street. He testified that he retrieved his knife from Myers' car and hid it in his clothing because DiIorio kept "mad-dogging" him (staring at him), and because DiIorio had earlier threatened him with a knife as he talked to Kouri. The appellant further testified that he went to Kouri's car to confront DiIorio after learning from Myers that DiIorio had raped Hessler. The appellant stated that, as he approached the passenger's door, DiIorio extended his right arm out of the window and slashed at him with a knife, as though he was trying to get him away from the vehicle. The appellant claimed that DiIorio then started to open the door, at which time the appellant slammed it shut and stabbed DiIorio in the chest. The appellant testified that he stabbed DiIorio because he felt threatened by DiIorio's actions and did not believe that he could safely retreat.

### Did the district court err in denying the appellant's motion for judgment of acquittal on the first-degree murder charge?

#### Standard of Review

[¶ 10] Motions for judgment of acquittal are governed by W.R.Cr.P. 29, which provides in relevant part as follows:

(a) *At close of evidence.*—Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, information or citation after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the state is not granted, the defendant may offer evidence without having reserved the right.

* * * *

(c) *After discharge of jury.*—If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 10 days after the

jury is discharged or within such further time as the court may fix during the 10–day period. If a verdict of guilty is returned, the court may on such motion set aside the verdict and enter judgment of acquittal within 10 days after such motion is filed, and if not so entered shall be deemed denied, unless within such 10 days the determination shall be continued by order of the court, but a continuance shall not extend the time to a day more than 30 days from the date the verdict is returned. If no verdict is returned, the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury.

■■ [¶ 11] We apply the following standard in reviewing the denial of a motion for judgment of acquittal:

"In reviewing the denial of a motion for judgment of acquittal, we examine and accept as true the evidence of the prosecution together with all logical and reasonable inferences to be drawn therefrom, leaving out entirely the evidence of the defendant in conflict therewith.

A motion for judgment of acquittal is to be granted only when the evidence is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime. Or, stated another way, if there is substantial evidence to sustain a conviction of the crime, the motion should not be granted. This standard applies whether the supporting evidence is direct or circumstantial."

*Wise v. State*, 654 P.2d 116, 117 (Wyo.1982) (*quoting Weathers v. State*, 652 P.2d 970, 972 (Wyo.1982)). We do not substitute our judgment for that of the jury; rather, we determine whether a reasonable jury could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Hankinson v. State*, 2002 WY 86, ¶ 6, 47 P.3d 623, 626 (Wyo.2002); *Robinson v. State*, 11 P.3d 361, 368 (Wyo.2000), *cert. denied*, 532 U.S. 980, 121 S.Ct. 1620, 149 L.Ed.2d 483 (2001). An appellant must support his motion for judgment of acquittal with "something more than a reference to

defense evidence that, if believed by the jury, would have supported acquittal." *Harlow v. State*, 2005 WY 12, ¶ 52, 105 P.3d 1049, 1071 (Wyo.2005).

■■ [¶ 12] Where a defendant introduces evidence after denial of a motion for judgment of acquittal made at the end of the State's case, he waives that motion, and only a similar motion made after return of the verdict may be claimed as error. *Id.*, ¶ 50, 105 P.3d at 1070; *Robinson*, 11 P.3d at 368; *Hodges v. State*, 904 P.2d 334, 339 (Wyo. 1995).

### Discussion

[¶ 13] The appellant was charged with a single count of first-degree murder. The jury was instructed that the elements of that crime are:

1. On or about the 18th day of June, 2003;
2. In Natrona County, Wyoming;
3. The Defendant Brandon Keith Butcher;
4. Unlawfully and purposely; and
5. With premeditated malice;
6. Killed a human being, John DiIorio.

[¶ 14] At the close of the State's case, defense counsel moved for judgment of acquittal on the ground that "the State has not met its burden to show either premeditated malice or malice." The district court denied that motion, and the appellant proceeded to present evidence. Consequently, he has waived his right to challenge that denial on appeal. After trial, however, the appellant renewed his motion for judgment of acquittal, on the same grounds as his earlier motion. Despite the intervening conviction for the lesser-included offense of second-degree murder, the latter motion sought "judgment of acquittal on the single count contained in the information." That motion, like the earlier one, was denied.

■■ [¶ 15] This Court must confess a certain amount of confusion as it addresses this issue. The appellant's brief contains nineteen pages of argument in which it is contended that the State did not prove either premeditation or deliberation, and that,

therefore, the charge of first-degree murder should not have gone to the jury. Our confusion arises out of the fact that, by finding the appellant guilty of the lesser-included offense of second-degree murder, the jury had, in effect, acquitted him of the charged offense of first-degree murder. There can be no possible error or prejudice here. Even if the district court had granted the appellant's post-verdict motion for judgment of acquittal on the charge of first-degree murder, that would have had no effect upon the finding of guilt on the lesser-included offense.[1]

### Was there sufficient evidence to sustain the finding of guilt on the lesser-included offense of second-degree murder?

### Standard of Review

■ [¶ 16] In *Leyva v. State*, 2005 WY 22, ¶ 7, 106 P.3d 873, 875 (Wyo.2005) (*quoting Lopez v. State*, 2004 WY 28, ¶ 16, 86 P.3d 851, 857 (Wyo.2004)), we recently reiterated the applicable standard of review for this issue:

The standard of review for sufficiency of the evidence issues is well established. "We assess whether all the evidence presented is adequate to form the basis for an inference of guilt beyond a reasonable doubt to be drawn by a finder of fact when that evidence is viewed in the light most favorable to the State." *Estrada–Sanchez v. State*, 2003 WY 45, ¶ 6, 66 P.3d 703, ¶ 6 (Wyo.2003).

"We leave out of consideration the evidence presented by the unsuccessful party which conflicts with the successful party's evidence and afford every favorable inference to the successful party's evidence which may be reasonably and fairly drawn from that evidence. Even though it is possible to draw other inferences from the evidence presented, the jury has the responsibility to resolve conflicts in the evidence. We will not

substitute our judgment for that of the jury when we are applying this rule; our only duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did."

### Discussion

[¶ 17] The jury was instructed that the elements of the lesser-included offense of second-degree murder are:

1. On or about the 18th day of June, 2003;
2. In Natrona County, Wyoming;
3. The Defendant Brandon Keith Butcher;
4. Unlawfully and purposely; and
5. Maliciously;
6. Killed a human being, John DiIorio.

■ [¶ 18] The appellant's sufficiency of the evidence argument starts out plainly enough with this averment: "In this case, there was insufficient evidence of both purpose and malice." Unfortunately, this clearly stated premise is then buried under a landslide of muddied legal assertions and evidentiary conclusions not supported by the record. The result is a complicated olio of contentions involving general intent, specific intent, malice, purpose, and deliberation. It is as if counsel did not notice that the jury acquitted the appellant of the specific intent crime of first-degree murder.[2]

[¶ 19] These meanderings aside, we believe the appellant's intention is as first stated in his brief; that is, he challenges the sufficiency of the evidence to prove either purpose or malice. The words "purposely" and "maliciously" were defined for the jury as follows:

"Purposely" means that the act which caused the death was intentionally done.

---

1. Perhaps the appellant is attempting through this argument to hint that this was a compromise verdict, and that he would have preferred a compromise between second-degree murder and manslaughter. There is no legitimacy to such an argument.

2. Two of the appellant's appellate contentions are, for instance, that "there was little credible evidence that disputed Mr. Butcher's testimony that he did not intend a death to occur, and that he did not approach the victim with that purpose in mind[,]" and "[t]here was no evidence that Mr. Butcher ever stated that he intended to *kill* the victim . . . ."

"Maliciously" means the state of mind in which an intentional act is done without legal justification or excuse. The term "maliciously" conveys the meaning of hatred, ill will or hostility toward another.

This instruction, which duplicates Wyoming Criminal Pattern Jury Instruction 21.04(b) (1996), was given precisely as offered by the appellant, and neither side objected to it.

[¶ 20] The element of "purposely" in a second-degree murder charge means intentionally or deliberately. *Lopez*, 2004 WY 28, ¶ 18, 86 P.3d at 857. Furthermore, second-degree murder is a general intent crime in which the "purposely" element requires only that the State prove the appellant *acted* purposely, not that he *killed* purposely. *Id.; see also Wilks v. State*, 2002 WY 100, ¶¶ 37–38, 49 P.3d 975, 990 (Wyo.2002). "Purposely" in this context simply distinguishes the act from one committed "carelessly, inadvertently, accidentally, negligently, heedlessly or thoughtlessly." *Lopez*, ¶ 18, 86 P.3d at 857 (*quoting State v. Keffer*, 860 P.2d 1118, 1138 (Wyo.1993)).

[¶ 21] It is safe to say that the evidence in the present case conclusively established that the appellant acted purposely in committing the act that caused DiIorio's death. After experiencing some sort of "mad-dogging" incident with the victim, and after confirming the victim's identity as the man who had raped a friend, the appellant armed himself, refused entreaties to desist from confronting DiIorio, approached DiIorio and intentionally stabbed him. The defense at trial was not "I didn't do it," or even "I did it accidentally or carelessly or negligently." The defense was "I did it in self-defense." Part of that self-defense argument was the appellant's concession that "I pulled my knife out, and I stabbed down into the car one time." The appellant's bald assertion in his appellate brief to the contrary notwithstanding, there

was not a hint of evidence at trial that the appellant acted in any manner other than purposely in stabbing DiIorio.

[¶ 22] There is in the district court file a sheet of paper that reads as follows:

Instruction # 9 + # 13

Definitions for "purposely" are not the same.

Could you please clarify definition for us?

[¶ 23] This item is identified in the clerk of court's index as "Questions by Jury to Judge." [3] The appellant contends that the existence of this note shows that the jury was confused about the "purposely" element and that this confusion somehow affected the verdict. However, the record does not reflect that this question was actually posed by the jury to the judge, or if so, how it was answered. We cannot assume from a blank record that the appellant was somehow prejudiced by something that appears not to have occurred. Furthermore, if there was any confusion and any resultant prejudice, the latter was to the State, rather than the appellant, inasmuch as the jury returned a verdict of guilt as to the lesser of the two crimes described in Instruction Nos. 9 and 13.[4]

[¶ 24] In regard to the element of malice, the appellant contends that "there was insufficient evidence in [the appellant's] case of the type of malice required to sustain a finding of murder at all, whether first or second degree." Preliminarily, we will note that the definition of malice in the instructions given to the jury, which definition originally came from *State v. Sorrentino*, 31 Wyo. 129, 224 P. 420, 423 (1924), misstates the holding of that case and has since been corrected. *See Strickland v. State*, 2004 WY 91, ¶ 15, 94 P.3d 1034, 1043 (Wyo.2004), and *Keats v. State*, 2003 WY 19, ¶¶ 16–33, 64 P.3d 104, 109–114 (Wyo.2003). Any error in the

---

3. Instruction No. 13 is the definitions instruction quoted above. It followed Instruction No. 12, which was the elements instruction for second-degree murder. Instruction No. 9 defined "purposely" as meaning "intentionally." It followed Instruction No. 8, which was the elements instruction for first-degree murder.

4. Also unexplained in the record are certain markings on the original of Instruction No. 13. The word "purposely" is circled, and the word "act" is underlined. Those markings indicate a correct understanding of the word's definition as an element of second-degree murder. We simply do not know if the jury made the markings, indicating that understanding, just as we do not know the origin or purpose of the note.

present case, however, inured to the benefit of the appellant because the definition given required the State to prove both an intentional act done without legal justification or excuse, and hatred, ill will, or hostility.

[¶ 25] What is the evidence that at the time the appellant stabbed DiIorio, he did so intentionally, without legal justification or excuse, and with hatred, ill will, or hostility? We need not repeat the evidence that the act of stabbing was intentional. There is no evidence to the contrary, and the appellant admitted that he intentionally stabbed DiIorio. Was there legal justification or excuse? The appellant testified that DiIorio struck at him with a knife and that he stabbed DiIorio in self-defense. Given that there were no other witnesses to the stabbing itself, the appellant asks this Court to apply the "*Eagan*" rule:

> Where an accused is the sole witness of a transaction charged as a crime, as in the case at bar, his testimony cannot be arbitrarily rejected, and if his credibility has not been impeached, and his testimony is not improbable, and is not inconsistent with the facts and circumstances shown, but is reasonably consistent therewith, then his testimony should be accepted.

*Eagan v. State*, 58 Wyo. 167, 128 P.2d 215, 226 (1942).

[¶ 26] In *Eagan*, the appellant was charged with first-degree murder for killing his wife by shooting her in the neck with a pistol. He claimed that the gun discharged accidentally, and there was evidence that the weapon was defective. On the basis of the above-stated rule, this Court set aside Eagan's second-degree murder conviction, but sustained a judgment for the lesser included offense of manslaughter based on criminal carelessness. *Id.* at 230.

[¶ 27] For several reasons, we will not apply the *Eagan* rule in this case. To begin with, the appellant did not request an *Eagan* instruction, which deficiency forecloses appellate review. *Wilks*, 2002 WY 100, ¶ 39, 49 P.3d at 991; *Dangel v. State*, 724 P.2d 1145, 1149 (Wyo.1986). Furthermore, even the appellant's own version of events supports his conviction. *See Wilks*, 2002 WY 100, ¶ 39, 49 P.3d at 991. And finally, other witnesses

testified as to the immediate events leading up to the killing, leaving the appellant's credibility far from unscathed and his testimony improbable. *See Griswold v. State*, 994 P.2d 920, 928 (Wyo.1999); *Dangel*, 724 P.2d at 1148; and *Leitel v. State*, 579 P.2d 421, 424–25 (Wyo.1978). The purpose of the *Eagan* rule is to prevent the arbitrary rejection of a defendant's testimony where he or she is the only witness to the crime, where his or her credibility has not been impeached, and where his or her story is reasonably consistent with the known facts and circumstances. Nearly the opposite situation exists here; the appellant's version of events is so inconsistent with the proven facts and circumstances that acceptance of that version would seem to be arbitrary, rather than reasonable.

[¶ 28] Going back then to the evidence of malice, we find that it was reasonable for the jury to conclude that the appellant's claim of self-defense was untrue. The appellant armed himself and instigated the confrontation with DiIorio. He voiced hostile thoughts about DiIorio immediately before the slaying, even threatening to "stick" or "stab" DiIorio. He persisted in approaching DiIorio despite Myers' plea that he go back inside the bar with her. And he used a deadly weapon in a deadly manner, from which an inference of malice·may be drawn. *See Bilderback v. State*, 13 P.3d 249, 252 (Wyo.2000); *Cutbirth v. State*, 663 P.2d 888, 891 (Wyo.1983); and *Leitel*, 579 P.2d at 424. There was sufficient evidence from which a reasonable jury could have found that the element of malice was proven beyond a reasonable doubt.

### Was the jury improperly instructed on the meaning of the word "purposely?"

**Standard of Review**

[¶ 29] We have often reiterated our standard for the appellate review of jury instructions and will not do so again here. *See Reilly v. State*, 2002 WY 156, ¶¶ 14–16, 55 P.3d 1259, 1264–65 (Wyo.2002); *Williams v. State*, 2002 WY 136, ¶¶ 11–12, 54 P.3d 248, 251 (Wyo.2002); *Black v. State*, 2002 WY 72, ¶¶ 5–7, 46 P.3d 298, 300 (Wyo.2002); *Brown v. State*, 2002 WY 61, ¶¶ 9–10, 44 P.3d 97, 100

(Wyo.2002); and *Ogden v. State,* 2001 WY 109, ¶¶ 8–12, 34 P.3d 271, 274 (Wyo.2001). Suffice it to say that, in criminal cases, an essential function of jury instructions is to instruct the jury concerning the elements of the crime. *Reilly,* 2002 WY 156, ¶ 16, 55 P.3d at 1265; *Williams,* 2002 WY 136, ¶ 11, 54 P.3d at 251. Failure to object to an instruction at trial forecloses appellate review of that instruction absent plain error. *Reilly,* 2002 WY 156, ¶ 14, 55 P.3d at 1264; *Ogden,* 2001 WY 109, ¶ 9, 34 P.3d at 274. Plain error exists only when (1) the record is clear concerning the alleged error; (2) a clear and unequivocal rule of law was violated; and (3) the appellant was materially prejudiced by denial of a substantial right. Furthermore, the doctrine of "invited error" prohibits a party from raising on appeal alleged trial court errors that were induced by that party's actions. *Hughes v. State,* 2003 WY 35, ¶ 22, 65 P.3d 378, 384 (Wyo.2003); *Blumhagen v. State,* 11 P.3d 889, 895 (Wyo. 2000); *James v. State,* 998 P.2d 389, 393 (Wyo.2000). As applied to jury instructions, the invited error doctrine provides that use of an instruction proposed by the appellant may not be grounds for reversal unless such was "necessarily prejudicial." *Vanvorst v. State,* 1 P.3d 1223, 1230 (Wyo.2000). *See also Wilson v. State,* 14 P.3d 912, 919 (Wyo. 2000); *Vigil v. State,* 859 P.2d 659, 664 (Wyo. 1993); and *Dallenbach v. State,* 562 P.2d 679, 681 (Wyo.1977).

### Discussion

[¶ 30] A brief review of the procedural setting will be helpful in this review. The appellant was charged with first-degree murder, which includes second-degree murder as a lesser offense. Wyoming's Criminal Pattern Jury Instructions for first-degree murder are found in Part 21.01, and those for second-degree murder are found in Part 21.04. In its proposed jury instructions, the State offered 21.01A (first-degree murder elements), 21.01C (first-degree murder definition of "purposely"), and 21.04A (second-degree murder elements), but not 21.04B (second-degree murder definition of "purposely"). The appellant, on the other hand, offered 21.01A (first-degree murder elements), 21.04A (second-degree murder elements), and 21.04B (second-degree murder definition of "purposely"), but not 21.01C (first-degree murder definition. of "purposely").

[¶ 31] The district court gave both elements instructions and both instructions defining "purposely." The definition instructions were the two instructions identified in the alleged jury note and discussed hereinabove in our consideration of the sufficiency of the evidence. Instruction No. 9, which followed the first-degree murder elements instruction, defined "purposely" as meaning "intentionally." Instruction No. 13, which followed the second-degree murder elements instruction, defined "purposely" as meaning "that the act which caused the death was intentionally done."

[¶ 32] In this third argument, the appellant repeats and enlarges upon his contention that the jury was confused by being given both of these definitions. Having already dealt with that contention, we will not do so again. The appellant goes on, however, and also argues that these definition instructions were improper because "the type of 'purposeful' conduct necessary to establish second degree murder cannot be undertaken thoughtlessly." We will not further consider this argument because, frankly, we are unable to make any sense of it.[5] There is not a

---

5. As with the appellant's earlier issues, this issue is hopelessly entangled in an inexplicable foray into the difference between first-degree and second-degree murder. For example, the appellant contends in his appellate brief as follows:

As long as the Wyoming Legislature retains hierarchical degrees and kinds of murder, the distinguishing factors between and among each sort of homicide must also be maintained. This maintenance presupposes careful and thorough instruction, and vigilance on the part of the courts to assure that prosecutors are not allowed to obtain improperly inflated convictions. Relying on the empty direction that "premeditation implies an interval, however brief, between the formation of the intent or design to kill and the commission of the act which resulted in death" (a notion not specified by the Wyoming Legislature), without requiring juries to debate and consider "deliberation" and "purpose" does not serve the purpose of preserving distinctions. If not checked by the courts, prosecutors will continue to charge and juries will continue to

hint of evidence in the record that the appellant's stabbing of DiIorio was "undertaken thoughtlessly," or that the jury convicted the appellant under any such standard. Second-degree murder requires that the death result from an act that was intentionally done, and that is how the jury was instructed. *Lopez*, 2004 WY 28, ¶ 18, 86 P.3d at 857. The evidence included the appellant's admission that he intentionally stabbed DiIorio. That evidence, alone, could have satisfied the "purposely" element of second-degree murder. In rejecting the appellant's self-defense claim, the jury could have convicted him of first-degree murder, but convicted him only of the lesser offense. Inasmuch as that process requires the jury first to consider the first-degree murder charge, the only rational inference to be made is that the jury fully understood and applied the law as it distinguishes between the two crimes, and resolved any doubts in the appellant's favor. Specifically, the jury must have understood the difference between the specific intent to kill required for first-degree murder and the general intent to do the act that results in death required for second-degree murder. There was no prejudice to the appellant.

### Was cumulative prejudicial "flight" evidence improperly admitted?

#### Standard of Review

[¶ 33] Generally, we review decisions regarding the admissibility of evidence for an abuse of discretion. *Law v. State*, 2004 WY 111, ¶ 14, 98 P.3d 181, 187 (Wyo. 2004); *Strickland*, 2004 WY 91, ¶ 29, 94 P.3d at 1048. Where there was no trial objection, however, the plain error standard applies: (1) the record must clearly reveal the alleged error; (2) there must have been an obvious violation of an unequivocal rule of law; and (3) the appellant must have been materially prejudiced by denial of a substantial right. *Brown v. State*, 2005 WY 37, ¶ 8, 109 P.3d 52, 55 (Wyo.2005).

#### Discussion

[¶ 34] In his appellate brief, the appellant lists the following in complaining

render verdicts in virtual disregard of deliber-

about the "great quantum" of flight evidence admitted at his trial:

1. Jeffrey Maxfield testified that he saw the appellant run toward him from the scene of the stabbing, and then run away.

2. Lance Thormalen testified that the appellant appeared at his house after the stabbing, changed his clothes and, with Thormalen's help, surreptitiously disposed of them.

3. Brittany Jensen testified, over the course of two days, about how the appellant appeared at her home in Glenrock the day after the stabbing and got her to take him all over Casper looking for resources.

4. During the course of cross examination of defense witness Kelleen Gilstad, who had testified on direct examination about the appellant's actions after the stabbing, the State adduced flight evidence.

5. In closing argument, the State referred to this flight evidence and characterized it as not being the actions of an innocent man.

[¶ 35] The first element of the plain error standard is met because the record clearly contains this testimony and argument. The second element has not been met, however, because the appellant has not shown how the admission of this testimony, or the prosecutor's referral to it in closing argument, violated a clear and unequivocal rule of law. This is not a case where a flight instruction was given, contrary to our holding in *Hadden v. State*, 2002 WY 41, ¶ 39, 42 P.3d 495, 508 (Wyo.), *cert. denied*, 537 U.S. 868, 123 S.Ct. 272, 154 L.Ed.2d 114 (2002). Rather, the appellant contends that it was improper to allow the jury to consider evidence of flight as substantive evidence of guilt and that admission of the flight evidence resulted in an unfair trial.

[¶ 36] While the appellant cites several cases and treatises for the proposition that flight is not very probative of guilt, he does not cite any authority for the proposition that flight evidence is not admissible. Perhaps that is because this Court has consistently held that evidence of flight is admissible as circumstantial evidence of guilt. *See Cure-*

ation and purpose.

ton v. State, 2003 WY 44, ¶ 11, 65 P.3d 1250, 1253 (Wyo.2003); Baier v. State, 891 P.2d 754, 760 (Wyo.1995); Miller v. State, 830 P.2d 419, 427 (Wyo.1992); Gentry v. State, 806 P.2d 1269, 1275 (Wyo.1991); Smizer v. State, 752 P.2d 406, 411 (Wyo.1988); Sanchez v. State, 694 P.2d 726, 730 (Wyo.1985); and Jones v. State, 568 P.2d 837, 845 n. 10 (Wyo. 1977).

[¶ 37] We assume that the appellant's objection to the use of flight evidence as "substantive" evidence of guilt has reference to the traditional view that such evidence, being only circumstantial, is not direct evidence of guilt, but may only support an inference of guilt based upon "consciousness of guilt." See Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 85 (2d ed.1994). Even if we assume that this traditional view is the law, we cannot see that admission of the flight evidence in this case violated that law. In fact, after summing up the flight evidence during closing argument, the prosecutor contended that such was "proof and evidence of how desperate and the consciousness of guilt that this man was involved with." There simply was no clear violation of an unequivocal rule of law.

### Did the prosecutor commit misconduct by eliciting irrelevant prejudicial evidence and by making improper argument?

#### Standard of Review

[¶ 38] Where there has been an objection below, claims of prosecutorial misconduct are reviewed under a harmless error standard:

Wyoming Rule of Appellate Procedure 9.04 states that "any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court." Wyoming Rule of Criminal Procedure 52(a) and Wyoming Rule of Evidence 103(a) contain similar provisions. The test for harmless error is as follows:

"An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. To demonstrate harmful error, the defendant must show prejudice under 'cir-

cumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play.' " Condra v. State, 2004 WY 131, ¶ 7, 100 P.3d 386, 389 (Wyo.2004) (quoting Dysthe v. State, 2003 WY 20, ¶ 10, 63 P.3d 875, 881 (Wyo. 2003)). Where there has not been an objection below, claims of prosecutorial misconduct are reviewed under the plain error standard set forth earlier herein. Condra, 2004 WY 131, ¶ 6, 100 P.3d at 389.

[¶ 39] We decide claims of prosecutorial misconduct by reference to the entire record, and where the claim is one of improper argument, we consider it in the context of the entire argument. Law, 2004 WY 111, ¶ 12, 98 P.3d at 191. We are reluctant to find plain error in a closing argument "lest the trial court becomes required to control argument because opposing counsel does not object." Belden v. State, 2003 WY 89, ¶ 38, 73 P.3d 1041, 1087 (Wyo.2003), cert. denied, 540 U.S. 1165, 124 S.Ct. 1179, 157 L.Ed.2d 1212 (2004) (quoting James v. State, 888 P.2d 200, 207 (Wyo.1994)). The question is whether, "based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused." Lopez v. State, 2004 WY 103, ¶ 56, 98 P.3d 143, 157 (Wyo.2004). "The burden of establishing prosecutorial misconduct rests upon the appellant who raises the issue." Lancaster v. State, 2002 WY 45, ¶ 32, 43 P.3d 80, 94 (Wyo.2002).

#### Discussion

[¶ 40] The appellant complains of seven incidents of alleged prosecutorial misconduct, four involving examination of witnesses and three involving closing argument:

1. During cross examination of the appellant, the following colloquy occurred:

Q. How long did you know Ashley Hessler?

A. Since about—I'd say February of 2003.

Q. And that's when you got out of prison?

A. About a month after.

The district court sustained defense counsel's objection to the second question as being

violative of W.R.E. 609,[6] as interpreted by *Ramirez v. State*, 994 P.2d 970, 973 (Wyo. 2000). The jury was then instructed that the question and answer had been stricken "from the jury's consideration."

2. Toward the end of the cross examination of the appellant, the following colloquy occurred:

Q. Now, [defense counsel] had inquired a little bit into the fact that you had been previously convicted of aggravated assault and battery?

A. Yes, sir.

Q. Isn't it true, Mr. Butcher, that you also were convicted of a robbery in connection to that same charge?

A. Yes, sir.

Q. And you received a five-to-seven-year sentence for those charges?

Defense counsel's objection to the last question on the same basis as its earlier objection was sustained, and the jury once again was instructed that the question was stricken.

3. During the examination of Lance Thormalen, a witness for the State, the following question and answer occurred, to which defense counsel did not object:

Q. Did he say anything else?

A. Just that he had plans for Rawlins already. He was kind of looking forward to going back.

4. During the examination of Brittany Jensen, a witness for the State, the following question and answer occurred, to which defense counsel did not object:

Q. And how long have you known Mr. Butcher?

A. I knew him when I was younger, but I didn't know him well like a friend, so I didn't know him until he got out of prison this time.

5. During rebuttal closing, the prosecutor, without objection, responded as follows to defense counsel's argument that the State had tremendous power in making a decision to charge first-degree murder:

The tremendous and awful power of the State. I wish I had some of that power right now because I'm awful tired. You know, I've been working 12– and 14–hour days because I got a tremendous responsibility in analyzing all this information. Trying to figure out who to call to the witness stand, trying to figure out what it is that they're going to say. And they want you to believe that somehow I've got a whole lot more power than they got and that this power is awful. And I told you that my job basically is to get to the bottom of the truth.

6. Later in rebuttal closing, while discussing an eight-inch knife the appellant had at some time before this incident left in a third person's car, the prosecutor commented as follows, also without objection:

Now, if I was going to be attacked by a knife like that one—I wouldn't want to, but if I was, I'll guarantee you I'd want that person sitting in the car when they tried to do it because all you're going to do is jump back. . . .

7. In concluding his rebuttal closing, the prosecutor made the following comment, to which there was no objection:

He makes reference to the fact that— something to the effect that my job is to fill in gaps or I didn't fill in the gaps. Well, my job isn't to fill in the gaps. That's what we've been trying to do for the last week is fill in the gaps for you ladies and gentlemen so that you can come to a hard concrete and fair decision based on facts and based on supported by the law.

[¶ 41] Turning first to the two questions posed to the appellant during cross examination, we note again that both questions and answers were stricken by the district court pursuant to *Ramirez*, 994 P.2d at 973, which interpreted W.R.E. 609 as limiting evidence of a witness's prior convictions for impeachment purposes to the fact of a prior felony

---

6. W.R.E. 609(a) provides that

[f]or the purpose of attacking the credibility of a witness, (1) . . . evidence that an accused has been convicted of . . . a crime [punishable by death or imprisonment in excess of one (1) year under the law under which the witness was convicted] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused[.]

conviction, what the felony was, and the date of the conviction. The effect of the district court striking these questions and answers was to remove them from the evidence to be considered by the jury. At the outset of the trial, and again prior to deliberations, the jury was instructed that "if any evidence is admitted and afterwards is ordered by me to be stricken out, you must disregard entirely the matter thus stricken...." We presume that the jury followed these instructions. *Allen v. State*, 2002 WY 48, ¶ 76, 43 P.3d 551, 575 (Wyo.), *cert. denied*, 537 U.S. 899, 123 S.Ct. 201, 154 L.Ed.2d 170 (2002); *Ramirez v. State*, 739 P.2d 1214, 1220 (Wyo.1987).

[¶ 42] Applying the harmless error standard, we cannot say that there is any likelihood that the verdict would have been more favorable to the appellant in the absence of these questions and answers. W.R.E. 609 authorized the State to elicit evidence of the fact, nature, and date of the appellant's felony conviction. The only additional information presented to the jury was the length and date of imprisonment. Even without our presumption that the jury followed the district court's instructions and disregarded the latter information, it is extremely unlikely that such had any impact upon the verdict. Consequently, any error was harmless.[7]

[¶ 43] The third and fourth allegations of prosecutorial misconduct concern non-responsive answers from State witnesses to innocuous questions asked by the prosecutor. The effect of both was to inform the jury that the appellant had been in prison. The appellant has not alleged that the prosecutor purposely asked the questions, knowing that the witnesses would violate the dictates of *Ramirez*, 994 P.2d at 973. Without such, the appellant simply cannot satisfy the second requirement of the plain error rule; that is, he cannot show the clear violation of an unequivocal rule of law.[8] Furthermore, given the strong evidence of guilt in this case, and

given the fact that the jury already knew of the appellant's felony conviction, we cannot see any likelihood that he was prejudiced by this additional information. Perhaps that is why trial counsel did not object.

[¶ 44] The appellant's next allegation of prosecutorial misconduct is directed to the prosecutor's comments during rebuttal closing about the "tremendous and awful power of the State." We have set out above the full statement of the prosecutor, and will not repeat it here. The appellant characterizes this statement as misconduct because the prosecutor "crossed the line" by personalizing the case and, essentially, testifying. The prosecutor's statement did not, however, occur in a vacuum. During closing argument, defense counsel stated as follows:

> What a tremendous power it is to charge someone with first-degree murder. Tremendous power. We, as citizens, grant this power to the district attorney. And when we do, we trust and we hope that they will use this power wisely. They haven't done that, ladies and gentlemen. They haven't done that because now first, second, [degree murder] it doesn't matter. Murder is murder. But is that the truth? We'll talk about these charges a little bit later.
>
> When we grant this tremendous power, we say, Please do not abuse this power. In this case, that power was abused.

[¶ 45] We do not find prosecutorial misconduct in the prosecutor's response to the "tremendous power" allegations made by defense counsel in her closing argument. The State is allowed to respond to such allegations. *Moore v. State*, 2003 WY 153, ¶ 32, 80 P.3d 191, 197 (Wyo.2003). Although the prosecutor's personalized "I'm awful tired" comment pretty much missed the mark as a response, and the added comment that "my job basically is to get to the bottom of the

---

7. That is not to say that we accept the State's appellate argument that "the prosecutor was merely attempting to establish the requisite foundation for the admissibility of appellant's prior convictions under rule 609." One does not lay the foundation for legitimate questions by asking illegitimate questions.

8. *Black's Law Dictionary* 1237 (7th ed.1999) defines "prosecutorial misconduct" as "[a] prosecutor's improper or illegal act (or failure to act), esp. involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment." Surely, an allegation of prosecutorial misconduct cannot be sustained on the basis of an apparently innocent question.

truth" came dangerously close to personal vouching, we conclude that, in the context of the full record and the entirety of the parties' arguments, there was neither a clear violation of an unambiguous law, nor any resultant prejudice to the appellant. If the appellant was overcharged, the jury took care of that by finding him guilty of a lesser-included offense.

[¶ 46] The next allegation of prosecutorial misconduct is directed at the prosecutor's stated desire not to be "attacked by a knife like that one." The appellant contends that the prosecutor personalized the case, testified, and raised a topic not touched upon in the defense closing. The full context of that statement, with the complained-of portion highlighted, is as follows:

> Now, he walked over here and pulled this knife out and said, Well, I certainly wouldn't want this knife flung at me or swung at me. Well, nobody would want this knife flung or swung at them. This is a three-and-a-half inch blade. The one that Mr. Butcher had was eight inches long. You saw him hold that ruler up and show it and hold it like that. And what did Ginger Casciato tell us? Mr. Butcher when he borrowed her car stuck that eight-inch knife with no sheath on it whatsoever right in between her seat so that he could have access to that thing any time, anyhow.
>
> * * * *
>
> I asked Mr. Butcher, you know, why do you carry knives? Well, I run around with some awful crazy people. Sounds like somebody that likes to use knives, doesn't it, ladies and gentlemen? And someone that always has access to one right there and then when he needs it.
>
> *Now, if I was going to be attacked by a knife like that one—I wouldn't want to, but if I was, I'll guarantee you I'd want that person sitting in the car when they tried to do it because all you're going to do is jump back.* And while he's trying to open the door and get outside, you're flat

down the road. And that is the responsibility and the duty that Mr. Butcher had. And that's exactly what Instruction Number 28 and Number 23 tell you. And that's why I told you to pay attention to those.

[¶ 47] The totality of this passage is a proper commentary upon the evidence, and is a proper response to the appellant's self-defense argument, despite the prosecutor's momentary lapse into personalization.[9] Furthermore, it was a proper topic for rebuttal because defense counsel spent considerable time during his closing argument discussing different knives and their sizes. In fact, the highlighted portion of the prosecutor's statement is more a comment on the evidence than it is a personal statement. The point of the statement is to evaluate the need for deadly force under the circumstances. And even if it was improper, there is little likelihood of prejudice in this one isolated comment in the midst of all the evidence and argument about knives.

[¶ 48] Finally, the appellant complains that the prosecutor's "fill in the gaps" argument was a "self-testimonial combined with personal attack on defense counsel." Once again, however, the prosecutor's statement must be reviewed in context. It was, no doubt, made in response to the following allegation made by defense counsel in his closing argument:

> And whether Mr. Butcher said to him John DiIorio swept at me with a knife or whether he said he was in a fight with him, again, I can't tell you which took place and I won't try to. *I won't try to fill in the gaps like [the prosecutor] was trying to do.* I want you to rely on the evidence we do have. Not what might have happened, not what should have happened, not what could have happened; but the evidence that we can rely on that we do know what happened.

(Emphasis added.)

[¶ 49] Because there was no objection at trial, the question here is whether the prose-

---

9. The passage is confusing because three knives are being discussed, without clear distinction: the three-and-a-half-inch knife found in Kouri's car after DiIorio's death which the appellant

claims DiIorio swung at him through the car window, the eight-inch murder weapon, and an eight-inch knife the appellant once placed in witness Ginger Casciato's car.

cutor's response, set forth hereinabove as allegation number seven, amounted to plain error. It did not. In his brief, the appellant supports this allegation by citing to cases describing the prosecutor's "special aura of legitimacy" and condemning the practice of prosecutors offering personal opinions on the evidence or the defendant's guilt. *See Cargle v. Mullin,* 317 F.3d 1196, 1218 (10th Cir. 2003); and *United States v. Splain,* 545 F.2d 1131, 1134 (8th Cir.1976). While we can agree that this is the law, we do not believe that it was violated in this case. We have trouble, at the outset, construing the prosecutor's words as a personal opinion or belief about anything. Secondly, prosecutors are allowed to respond to the closing arguments of defense counsel. *Moore,* 2003 WY 153, ¶ 32, 80 P.3d at 199; *Fortner v. State,* 835 P.2d 1155, 1158 (Wyo.1992). And finally, under plain error analysis, the appellant has the burden of showing prejudice. Here, the prosecutor's internally contradictory statement—"my job isn't to fill in the gaps. That's what we've been trying to do for the last week is fill in the gaps"—simply cannot be seen to have had any effect upon the eventual verdict. Neither can the words that followed—"so that you can come to a hard concrete and fair decision based on facts and based on supported by the law."

[¶ 50] We have said many times that we are reluctant to find plain error in closing arguments because we do not want to place the district court in the position of having to act as opposing counsel. *Belden,* 2003 WY 89, ¶ 38, 73 P.3d at 1087. We would expect that appellate counsel would begin to take us at our word in that regard, and would raise as plain error only those closing arguments that did, indeed, violate an unambiguous rule of law in an unambiguous manner, and that, at least arguably, resulted in prejudice to the appellant. This innocuous passage about filling in the gaps or not filling in the gaps just does not come close to plain error.

## CONCLUSION

[¶ 51] The district court did not err in denying the appellant's motion for judgment of acquittal as to first-degree murder, and there was sufficient evidence to support the appellant's conviction for the lesser-included offense of second-degree murder. The jury was properly instructed as to the meaning of the word "purposely," no prejudicial "flight" evidence was improperly admitted, and prosecutorial misconduct did not occur during witness examination or closing argument.

[¶ 52] Affirmed.