2009 WY 2

**Jeffery Lynn SMITH, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–07–0267.

Supreme Court of Wyoming.

Jan. 13, 2009.

Representing Appellant: Diane M. Lozano, State Public Defender, PDP; Tina N. Kerin, Appellate Counsel; Michael H. Reese, Appellate Counsel. Argument by Mr. Reese.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Graham M. Smith, Assistant Attorney General. Argument by Mr. Smith.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] A jury found Jeffery Lynn Smith guilty of second degree murder and concluded he was a habitual criminal. The district court sentenced him to life in prison. On appeal, Mr. Smith claims there was insufficient evidence to convict him; the State violated his Fifth Amendment rights and engaged in prosecutorial misconduct by referring to his refusal to voluntarily submit a sample for DNA testing; the district court erred by excluding evidence of alternative suspects; the habitual criminal statute, as applied to him, violated the constitutional prohibition against *ex post facto* laws; and he should have been granted a change of venue.

[¶ 2] We conclude the evidence was sufficient to support the jury's verdict and the district court did not commit any reversible errors. Consequently, we affirm.

### ISSUES

[¶ 3] The issues for our consideration are:

    1. Whether there was sufficient evidence to support the jury's verdict.

    2. Whether the prosecutor violated Mr. Smith's constitutional right to remain silent when he elicited testimony about, and

commented upon, Mr. Smith's refusal to voluntarily submit a sample for DNA testing.

3. Whether the trial court erred when it excluded evidence of alternative suspects.

4. Whether the habitual criminal statute, as applied in this case, violated constitutional protections against *ex post facto* laws or was otherwise not applicable.

5. Whether the district court erred by denying Mr. Smith's motion for a change of venue after an article about the case appeared in the Casper Star Tribune on the first day of the trial.

## FACTS

[¶ 4] On April 28, 1986, Tammy Dively's dead body was discovered near Hat Six Road off Interstate 25 in Natrona County. An autopsy revealed that she had suffered multiple injuries, including blunt force trauma to her skull and injuries suffered from being run over by a vehicle. The coroner ruled the death a homicide. The coroner took biological samples from the victim's vaginal pool, which tested positive for seminal fluid. Although several persons of interest, including Mr. Smith, were interviewed, no arrests were made at that time.

[¶ 5] In 2006, investigators located Mr. Smith, who was in jail in Nebraska, and again interviewed him. The investigators asked him to submit a sample for DNA testing. He refused, but the officers obtained a search warrant and took a DNA sample anyway. Tests revealed the seminal fluid retrieved from Ms. Dively's body was Mr. Smith's.

[¶ 6] Mr. Smith was charged with second degree murder and being a habitual criminal. The district court convened a jury trial on May 7, 2007. At the conclusion of the trial, the jury returned a guilty verdict on the second degree murder charge. The jury also determined Mr. Smith was a habitual criminal. The district court sentenced him to serve life in prison, and he appealed.

## DISCUSSION

### 1. Sufficiency of the Evidence

[¶ 7] Mr. Smith was convicted of second degree murder. Second degree murder is statutorily defined as: "Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree[.]" Wyo. Stat. Ann. § 6-2-104 (LexisNexis 2007). The jury in this case was instructed:

> The elements of the crime of Second Degree Murder are:
>
> 1. On or about April 28, 1986;
>
> 2. In Natrona County, Wyoming;
>
> 3. The Defendant, Jeffery Lynn Smith;
>
> 4. Purposely and;
>
> 5. Maliciously;
>
> 6. Killed Tammy Dively.
>
> If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, you should find the Defendant "guilty" of Second Degree Murder.
>
> If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the Defendant "not guilty" of Second Degree Murder.

[¶ 8] In determining whether there was sufficient trial evidence to sustain a conviction, we apply the following standard of review:

> In reviewing the sufficiency of the evidence ..., we examine and accept as true the State's evidence and all reasonable inferences which can be drawn from it. We do not consider conflicting evidence presented by the defendant. We do not substitute our judgment for that of the jury; rather, we determine whether a jury could have reasonably concluded each of the elements of the crime was proven beyond a reasonable doubt. This standard applies whether the supporting evidence is direct or circumstantial.

*Martin v. State*, 2007 WY 2, ¶ 32, 149 P.3d 707, 715 (Wyo.2007), citing *Butcher v. State*, 2005 WY 146, ¶ 16, 123 P.3d 543, 549 (Wyo. 2005).

[¶ 9]   Mr. Smith maintains that there was insufficient evidence that he committed the homicide.  The day after the murder, April 29, 1986, officers interviewed Ms. Dively's young daughter.  She identified a house in the neighborhood where she said one of her mother's friends lived.  She told the investigators that she thought her mother had gone to the house the previous evening to purchase marijuana.

[¶ 10]   Mr. Smith was one of the men who lived in the house the daughter identified, and the officers interviewed him shortly after the murder.  A transcript of the interview was admitted into evidence at trial.  Mr. Smith told officers that Ms. Dively had come to his house the night she died, asking for his roommate.  He said she left after he told her his roommate was not home.  Mr. Smith stated that he did not know Ms. Dively very well.

[¶ 11]   In 2006, investigators located Mr. Smith, who was in jail in Nebraska, and again interviewed him.  During that interview, he contradicted his earlier statements by saying that he did not know Ms. Dively at all.  Pursuant to a warrant, the investigators obtained a sample of Mr. Smith's DNA.

[¶ 12]   Contrary to Mr. Smith's statement that he did not know Ms. Dively, DNA testing established that they had engaged in sexual contact prior to her death.  The Natrona County Coroner, James Thorpen, M.D., testified that spermatozoa and prostatic acid phospatase, which are components of seminal fluid, were found on the vaginal swab taken during the autopsy.  Kevin Noppinger, the State's DNA expert, testified that the DNA test results excluded everyone on earth except Mr. Smith as the donor of the semen discovered in Ms. Dively's body.  The medical experts also testified that, while spermatozoa may be discovered in the vaginal pool for several days after sexual activity, prostatic acid phospatase will generally dissipate within 24 to 30 hours after sexual contact.  The vaginal swabs were taken 19 ½ hours after Ms. Dively's death was reported.  Dr. Thorpen testified that the fact that prostatic acid phospatase was found in Ms. Dively's vaginal pool was consistent with sexual activity between the victim and Mr. Smith shortly before her death.

[¶ 13]   Lawrence "Larry" Malone, a friend of Ms. Dively's, testified that between 6:15 and 6:30 p.m. on the evening of her death, he witnessed her get into a blue truck with a white cab.  He believed the truck was a GMC or Chevrolet, model year somewhere between 1967 and 1972.  Consistent with Mr. Malone's testimony, Ms. Dively's daughter testified that she had looked out the window and saw her mother walking toward a blue pickup.  She stated that was the last time she saw her mother alive.  Ms. Dively's lifeless body was discovered by a passerby around 7:45 p.m. that same night.

[¶ 14]   In 1986, Mr. Smith owned a truck consistent with Mr. Malone's description.  Mr. Malone testified that a photograph of Mr. Smith's truck looked like the truck he saw the victim getting into.  He also stated that the man driving the truck had brown hair and part of it flipped over one eye.  A photograph of Mr. Smith from 1989 introduced into evidence at trial resembled the man Mr. Malone described as the driver of the truck.

[¶ 15]   Mr. Smith argues that the evidence that he committed the murder was circumstantial and, in order to conclude he murdered Ms. Dively, the jury had to improperly add inference to inference.  Our law is clear that, in reviewing the sufficiency of the evidence, we do not distinguish between direct and circumstantial evidence.  *Rawle v. State*, 2007 WY 59 ¶ 28, 155 P.3d 1024, 1031 (Wyo.2007).  Furthermore, as our standard of review states, reasonable inferences are allowed.

A permissible inference has been described as follows:

An inference is a process of reasoning by which a fact or proposition is deduced fairly and logically from other facts proven or admitted.  An inference is truly evidence.  The weight to which it is entitled depends upon the facts and circumstances of each case * * *.

*Story v. State,* 721 P.2d 1020, 1025 (Wyo.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986).

*Seeley v. State,* 959 P.2d 170, 176 (Wyo.1998).

[¶ 16] The trial evidence showed that Mr. Smith was not truthful with officers about his relationship with Ms. Dively. He clearly knew her better than he admitted, as the DNA evidence established he had engaged in sexual contact with her. Mr. Smith argues that the evidence of sexual contact does not prove that he killed Ms. Dively because the medical evidence established that they could have had sex many hours before her death. It is true that one of the inferences which could have been drawn from the medical evidence was that Mr. Smith and the victim engaged in consensual sex several hours before her murder. However, it was also reasonable for the jury to infer from the medical evidence that the time of the sexual activity between Ms. Dively and Mr. Smith was just prior to her death, strongly suggesting that he murdered her. That inference is also supported by the trial evidence that Ms. Dively got into a pickup, like one Mr. Smith owned, with a man that resembled him shortly before her death.

[¶ 17] When evidence is presented that is capable of producing conflicting inferences, the determination of which inference is proper should be left to the jury. *See, e.g., Michaelis v. State,* 2005 WY 80, ¶ 3, 115 P.3d 1098, 1100 (Wyo.2005). This is not a case where the jury had to engage in speculation or conjecture to conclude that Mr. Smith murdered Ms. Dively. Instead, the evidence, although circumstantial, together with the reasonable inferences emanating from it was sufficient to support the jury's verdict. On this record, the jury could have reasonably concluded that the State proved, beyond a reasonable doubt, Mr. Smith was Ms. Dively's murderer.

[¶ 18] Cases from other jurisdictions support our decision that there was sufficient evidence for the jury to conclude Mr. Smith murdered Ms. Dively. *Walker v. State,* 282 Ga. 406, 651 S.E.2d 12 (2007) had facts remarkably similar to those presented here. The victim was killed in 1989 and the medical examiner collected samples of sperm from the victim's vagina during the autopsy. Twelve years later, the swabs were sent for testing. The test revealed that the DNA on the swab matched Mr. Walker's profile, which was already in a DNA database. The trial evidence also revealed that, at the time of the victim's death, Mr. Walker frequently stayed at his grandmother's home, just a block away from the park near where the victim's body was discovered. Mr. Walker had also been observed in the park a few days after the murder. *Id.* at 14.

[¶ 19] Mr. Walker submitted that the evidence against him was insufficient because it was "completely circumstantial" and did not exclude other reasonable hypotheses which would have supported his innocence. *Id.* Like Mr. Smith, he maintained that the evidence could have supported the inference that he had consensual sex with the victim and then, later, someone else killed her. The court ruled that the role of interpreting the evidence belonged to the jury and the jury's decision would be reversed only if it was unsupportable as a matter of law. The court said that the jury was entitled to "reject as unreasonable the theoretical possibilities that Walker had a consensual encounter" with the victim and find, from the evidence presented, that the defendant murdered the victim. *Id.* at 14–15. *See also, People v. Saxon,* 374 Ill.App.3d 409, 312 Ill.Dec. 844, 871 N.E.2d 244, 251–52 (2007) (concluding it was appropriate for the fact finder to infer the defendant was the perpetrator from evidence that he had sexual intercourse with the victim and other contradicted circumstantial evidence).

[¶ 20] Mr. Smith also argues there was insufficient evidence that he acted purposely. The judge instructed the jury:

"Purposely" means intentionally.

"Malice" means that the act constituting the offense charged was done intentionally, without legal justification or excuse or that the act was done in such a manner as to indicate hatred, ill-will, or hostility towards another.

To prove Second Degree Murder the State must prove that the Defendant acted Purposely and Maliciously. However, the State is not required to prove that the Defendant intended to kill.

[¶ 21] Ms. Dively's body was found approximately 50 feet off the road. Dr. Thorpen testified that Ms. Dively had been hit on the head more than once, resulting in severe head trauma. She was subsequently run over by a vehicle at least twice. Deborah Lougee, a forensic scientist with the Montana Department of Justice, studied the tire track evidence and confirmed that Ms. Dively could have been run over more than once.

[¶ 22] Dr. Thorpen testified the "[m]anner of death was multiple severe traumatic injuries with collapse and herniation of both lungs, ruptured liver with massive abdominal hemorrhage, and blow to the right head with basilar skull fracture." He stated that the head injury could have been lethal, if she did not receive medical treatment, but the compression injuries from being run over were definitely lethal. Dr. Thorpen stated that the medical evidence did not indicate that Ms. Dively's death was accidental.

[¶ 23] There is no question that this evidence was sufficient to support the jury's conclusion that the homicide was committed purposely and with malice. As the jury was instructed, purposely means that the act was intentional. In the context of second degree murder purposely simply means the act was not committed "carelessly, inadvertently, accidentally, negligently, heedlessly or thoughtlessly." *Butcher*, ¶ 20, 123 P.3d at 550, quoting *Lopez v. State*, 2004 WY 28, ¶ 18, 86 P.3d 851, 857 (Wyo.2004), which quoted *State v. Keffer*, 860 P.2d 1118, 1138 (Wyo.1993). Similarly, malice means that the act was done intentionally, without legal justification or excuse or was accomplished in such a manner as to indicate hatred, ill-will or hostility towards another. The jury reasonably could have concluded that when Mr. Smith hit Ms. Dively on the head multiple times, ran over her at least twice and left her on the side of the road to die, he acted purposely and with malice. Mr. Smith's argument to the contrary is not plausible.

## 2. Prosecutorial References to Defendant's Refusal to Submit Sample for DNA Testing

[¶ 24] The prosecutor referred to Mr. Smith's refusal to submit a sample for DNA testing in his opening statement and closing argument and also elicited testimony about Mr. Smith's refusal from the lead investigator. Mr. Smith claims the prosecutor's questions and comments violated his constitutional right to remain silent and amounted to prosecutorial misconduct.

[¶ 25] The Fifth Amendment to the United States Constitution guarantees a criminal defendant the right to remain silent, so as not to incriminate himself. Wyoming Constitution Art. I, § 11 provides similar protection. *See, e.g., Tortolito v. State*, 901 P.2d 387, 389 (Wyo.1995) (on rehearing). The prosecutor violates a defendant's due process rights if he comments upon the accused's silence in order to infer guilt. *See, e.g., Doyle v. Ohio*, 426 U.S. 610, 618–19, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Wainwright v. Greenfield*, 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). Our standard of review on questions involving interpretation of constitutional rights is *de novo*. *See State v. Naple*, 2006 WY 125, ¶ 9, 143 P.3d 358, 361 (Wyo.2006).

[¶ 26] In addressing a claim of prosecutorial misconduct, our focus is on the prejudice suffered by the defendant. In *Gabbert v. State*, 2006 WY 108, ¶ 21, 141 P.3d 690, 697 (Wyo.2006), *abrogated on other grounds by Granzer v. State*, 2008 WY 118, 193 P.3d 266 (Wyo.2008), we described our standard of review as follows:

When reviewing a claim of prosecutorial misconduct, the entire record must be considered. Whether such misconduct is reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, our primary focus is whether an accused's case has been so seriously prejudiced by the error that a fair trial has been denied. *Butcher v. State*, 2005 WY 146, ¶ 38, 123 P.3d 543, 554 (Wyo.2005); *Lopez v. State*, 2004 WY 103, ¶ 56, 98 P.3d 143, 157 (Wyo.2004). This involves a determination as to whether, "based on the entire record, a reasonable possibility exists that, in the absence of the

error, the verdict might have been more favorable to the accused." *Lopez*, ¶ 56, 98 P.3d at 157. [The appellant] bears the burden of establishing prejudicial error. *Butcher*, ¶ 39, 123 P.3d at 554.

*See also, Szymanski v. State*, 2007 WY 139, ¶ 27, 166 P.3d 879, 886 (Wyo.2007).

[¶ 27] The United States Supreme Court has expressly ruled that the Fifth Amendment right against self-incrimination, i.e., the right to remain silent, only extends to testimonial or communicative evidence. In *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court explained that blood evidence obtained from a suspect's body is not testimonial or communicative evidence and does not, therefore, fit within the Fifth Amendment privilege.

> [T]he privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and ... the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends.

*Id.*

[¶ 28] Expanding upon *Schmerber*, the Supreme Court ruled in *South Dakota v. Neville*, 459 U.S. 553, 564, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), that the state court improperly held an implied consent statute which allowed a defendant's refusal to submit to a blood alcohol test to be used as evidence against him violated the privilege against self-incrimination. Although the decision considered South Dakota's implied consent statute, the Supreme Court's decision was not dependent upon the statutory language. Instead, the Supreme Court recognized that protecting the defendant from being *compelled* to testify against himself is the lynchpin of the Fifth Amendment protection. *Id.*

[¶ 29] In *Neville*, the defendant had been given the option of taking the test or refusing. The defendant was not, however, specifically informed that, if he refused, his refusal could be used as evidence against him. *Id.* at 555–56, 103 S.Ct. 916. While the Court recognized the choice was not always an easy one for a defendant, using his refusal against

him did not implicate Fifth Amendment concerns. The Court explained:

> [T]he values behind the Fifth Amendment are not hindered when the state offers a suspect the choice of submitting to the blood-alcohol test or having his refusal used against him. The simple blood-alcohol test is so safe, painless, and commonplace, see *Schmerber [v. California]*, 384 U.S. [757], 771, 86 S.Ct. [1826], at 1836 [16 L.Ed.2d 908], that respondent concedes, as he must, that the state could legitimately compel the suspect, against his will, to accede to the test. Given, then, that the offer of taking a blood-alcohol test is clearly legitimate, the action becomes no less legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice. Nor is this a case where the State has subtly coerced respondent into choosing the option it had no right to compel, rather than offering a true choice. To the contrary, the State wants respondent to choose to take the test, for the inference of intoxication arising from a positive blood-alcohol test is far stronger than that arising from a refusal to take the test.
>
> .... We hold, therefore, that a refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination.

*Id.* at 563–64, 103 S.Ct. 916.

[¶ 30] This Court has expressly adopted the same principles with respect to Art. I, § 11 of the Wyoming Constitution. In *City of Laramie v. Mengel*, 671 P.2d 340, 345–46 (Wyo.1983), we held that introduction of evidence that the defendant refused to take a blood alcohol test did not violate his state constitutional right against self incrimination.

[¶ 31] In *Deno v. Commonwealth*, 177 S.W.3d 753, 760 (Ky.2005), the Kentucky Supreme Court applied a similar rationale in a case involving a request for a DNA sample. The court concluded the Fifth Amendment was not implicated when the trial court admitted into evidence the appellant's refusal to provide a DNA sample and allowed the pros-

ecutor to argue such refusal was indicative of guilt. *Id.* *See also, Ferega v. State,* 286 Ga.App. 808, 650 S.E.2d 286, 288 (2007) (holding that "[t]he element of coercion necessary to trigger Fifth Amendment protection was clearly absent" where the defendant was specifically told that field sobriety tests were voluntary and he refused to take them).

[¶ 32] Here, the investigators asked Mr. Smith to voluntarily give a DNA sample; after he refused, they obtained a warrant to obtain the sample. The DNA sample and the associated test results were not testimonial or communicative evidence and the State could compel him to provide the sample. By giving him the choice of providing a sample or refusing, the State did not coerce him and the evidence of his refusal did not fall within the Fifth Amendment protection. We conclude, therefore, the prosecutor did not violate Mr. Smith's privilege against self-incrimination or commit prosecutorial misconduct by eliciting testimony about, or commenting upon, his refusal to voluntarily provide a sample for DNA testing.[1]

### 3. Alternative Suspect Evidence

[¶ 33] Mr. Smith claims the district court committed reversible error when it denied him the opportunity to present evidence of alternative suspects. Prior to the trial, Mr. Smith indicated that he planned to introduce evidence that Barney Myers or Charles Wentz had murdered Ms. Dively. The State filed a motion to exclude evidence of alternative suspects. The district court ordered Mr. Smith to provide an offer of proof, and he proffered the following:

*Barney Myers*

In 1995 Gary Myers contacted the Sheriff's Office regarding a lead with the death of Tammy Dively. During the interview, Gary implicated his father, Barney Myers. Barney Myers lived across the road and catty-corner from Tammy Dively. Barney also had a 1969 Blue Chevy pickup with a white cab in 1986 and during the time that Tammy Dively passed away. Barney's wife also let her granddaughter play with Tammy Dively's daughter. She would also provide food to Tammy on occasion. Barney was believed to have assisted Tammy Dively when she needed a lift to go shopping.

Gary Myer's belief that his father had something to do with the murder was triggered by his father shooting at his mother and other various statements that he had made about getting rid of women previously.

During the interview with Gary Myers on March 9, 1995, he stated that when his father would go fishing, Barney would discuss that he would get rid of his wife the way he had other women by sending them down the river. Gary Myers brought in pictures of the truck and his father. The pictures revealed that the truck at one point in time had black rims. Gary Myers further explained that his father had the truck detailed and new tires and rims put on the truck the day after Tammy Dively's death.

Gary Myers stated that the tires that his father had removed were in good condition and didn't need to be replaced. Gary remembered this particularly because the Sheriff's Office had asked his father about the truck right before he and his father were going fishing. He remember[ed] that his father had not mentioned the detailing and replacing

---

1. The State candidly admits that eliciting testimony and commenting about a suspect's refusal to give a sample for DNA testing may violate a defendant's Fourth Amendment right to be free from unreasonable searches and seizures. *See,* *e.g., United States v. Dozal,* 173 F.3d 787, 794 (10th Cir.1999) (ruling that asking the jury to draw adverse inferences from a refusal to consent to a search may be impermissible under the Fourth Amendment); *Deno v. Commonwealth of Kentucky,* 177 S.W.3d 753, 762 (Ky.2005) (stating that a defendant's pre-arrest refusal to provide a sample for DNA testing could not be used as evidence of his guilt under the Fourth Amendment). Mr. Smith, however, waived this issue by failing to raise it at trial or on appeal. *See, e.g., Lindsay v. State,* 2005 WY 34, ¶ 26, 108 P.3d 852, 859 (Wyo.2005). Moreover, Mr. Smith was not prejudiced from any such error because the arguably improper evidence and argument were very limited in the context of the entire trial and the other evidence of his guilt was convincing.

the tires on the truck to the Sheriff's Office, and he thought that this was odd.

He also stated that his father had several affairs. He also stated his father had pictures of naked young women in the home next to his bed. He wasn't sure if there was a picture of Tammy Dively or not.

The Sheriff's Office had executed a search warrant on the home of Barney Myers and the Blue pickup truck in 1995. The Sheriff's Office took numerous pictures of the truck in 1995, and the truck was in good condition at that time. There was a little rust, but the truck was manufactured in 1969.

The Sheriff's Office asked if Barney would submit a DNA sample, and he did. The DNA sample did not match the sample of the semen.

In an interview with Georgia Williams[,] a person believed to be at Tammy's home, and one of the people to see Tammy the last time before her untimely death, Georgia indicated that the truck she saw Tammy get into was parked across the street. The truck was a Blue pickup with a white cab. She also indicated that the person who owned the truck used to help Tammy run errands. When she was shown a picture of Barney Myers' truck, she stated that it looked like the truck that Tammy had gotten into. The only caveat was the truck she saw Tammy get into was a 4X4, and the picture she was shown looked to her like a two wheel drive.

When the Sheriff's Office interviewed Barney's wife, they indicated that they were 80–90% sure that he was the one who committed the murder.

*Charles (Chuck) Wentz Jr.*

When Investigator Mike Steinberg reopened the Dively case in February of 2006, he considered Mr. Wentz to be the possible murderer. Mr. Smith's proffer stated:

> Wentz's cousin Michael Day told law enforcement that Wentz confessed to him that he had run over and killed a female out on Hat Six Road. Most telling is that Wentz did not make this confession days, weeks, or months after the death of Tammy Dively, but on the very night she died. Not only did Day tell police officers that Wentz confessed to running someone over, Day also provided information to law enforcement that Day was present when Wentz returned home after running the woman over. He told law enforcement that Wentz's vehicle had blood on it and that Wentz urged Day to help him clean out Wentz's garage so the vehicle could be hidden. Day stated specifically that there was a spot of blood on the bumper of Wentz's vehicle. That Wentz tried to rub this spot of blood off but discovered it was a chip where the chrome was gone. Wentz then had Day help him remove the bumper from the vehicle. Day reports that Wentz then purchased a new bumper and headlight the next day. Day supplied law enforcement the locations of the purchases but there is nothing provided through discovery which indicates whether this information was verified or ruled out. This information is extremely important because although Day would have no way of knowing it, Divel[y] had suffered severe blunt force trauma to her head, trauma which could have been caused by being struck by a bumper as she was being run over.

> In his statements Day tells law enforcement that on the day Tammy was killed, Wentz went out looking for marijuana. At the earlier hearing the prosecutor in this case admitted that the evidence at trial will be that Tammy Dively went out looking for marijuana on the day she was killed as well; a fact that was not reported in the newspapers. This is circumstantial evidence which goes to opportunity and motive; evidence the jury should be allowed to hear as to the possibility that Divel[y] and Wentz could have met up [and] looked for marijuana together.

> Day also told investigators about a paper bag that Wentz did not want anyone to see or to know what the bag

contained. The jury will hear evidence that Tammy Dively was not wearing a bra when her body was found[,] an item which would easily have fit in the bag. Additionally there will be evidence that on the day she died, Tammy Dively had cashed her income tax check. Although seventy dollars was found on her body her check was for several hundred dollars a portion of which is unaccounted for, at least in the discovery provided by the State thus far. This becomes probative because Day tells investigators that in days immediately following Dively's death Wentz was flashing money around like a big shot. Day further tells investigators that this was very unusual because they were always broke. Once again this is probative circumstantial evidence which serves to corroborate Day's version of events.

Finally, even after twenty years of investigation the prosecution cannot supply any evidence as to why Mr. Smith would have taken Dively to Hat Six Road. However, the same is not true of Charles Wentz. There is evidence that Wentz at one time, not long before Dively['s] death lived on Coal Creek Road. Coal Creek Road ends where Hat Six Road begins with the dividing line being Interstate 25. Coal Creek Road heads north, Hat Six south. Therefore Wentz would have been familiar with the Hat Six Road area. Day also mentions an individual who [was] know[n] as the "Mountain Man" who lived in the Coal Creek/Hat Six area and sold marijuana around the time of Dively's death. More circumstantial evidence that the jury, as the fact finders in the case[,] should be allowed to consider.

[¶ 34] The district court conducted a pretrial hearing pursuant to W.R.E. 104(a) and (c).[2] It concluded that the evidence about Barney Myers, except evidence that he "owned a particular truck and gave Dively rides" was inadmissible under W.R.E. 403. The district court also ruled that Mr. Day's proposed testimony regarding Mr. Wentz's statements was inadmissible hearsay. The court stated that the other proffered evidence about Mr. Wentz as an alternative suspect was not admissible under W.R.E. 403 because its probative value was very small while the possibility of confusion of the issues and misleading the jury was high.

[¶ 35] Mr. Smith maintains on appeal that the district court denied his constitutional right to present a complete defense, pursuant to the compulsory process clause of the Sixth Amendment to the United States Constitution and the due process clause of the Fourteenth Amendment, when it prohibited him from presenting evidence implicating Barney Myers and/or Chuck Wentz in Ms. Dively's death. To the extent Mr. Smith's argument involves a constitutional issue, we review it *de novo*. *Bush v. State*, 2008 WY 108, ¶ 58, 193 P.3d 203, 217 (Wyo.2008); *Hannon v. State*, 2004 WY 8, ¶ 13, 84 P.3d 320, 328 (Wyo.2004). The issue of whether the evidence was properly excluded, however, is reviewed for abuse of discretion. *Bush*, ¶ 58, 193 P.3d at 217; *Vigil v. State*, 2004 WY 110, ¶ 17, 98 P.3d 172, 177. "A trial court abuses its discretion when it could not have reasonably concluded as it did. In this context, 'reasonably' means sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious." *Szymanski*, ¶ 15, 166 P.3d at 883 (citations omitted).

[¶ 36] Mr. Smith argues that the district court arbitrarily applied a more stringent evidentiary standard to him, as a criminal defendant, to procure admission of evidence than it applied to the State. He points to many cases in which courts have declared unconstitutional rules that impose, without justification, a greater evidentiary burden on

---

2. W.R.E. 104 states, in relevant part:

(a) *Questions of Admissibility Generally.*—Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

. . . .

(c) *Hearing of Jury.*—. . . Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if he so requests.

defendants than the prosecution. For example, the United States Supreme Court ruled in *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), that a rule which allowed an accomplice to testify for the state but not for a defendant was unconstitutional. In *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), the Supreme Court decided that a rule which prevented a criminal defendant from presenting evidence of alternative suspects if the state's case were sufficiently strong deprived the defendant of his constitutional right to present a defense.

[¶ 37] In preparing his brief, Mr. Smith did not have the benefit of our recent decision in *Bush*. Analyzing *Holmes* and other alternative suspect evidence cases, we stated:

> The United States Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986); *Hannon*, ¶ 62, 84 P.3d at 346. "[T]he Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote." *Holmes*, 547 U.S. at 327, 126 S.Ct. 1727. However, the Constitution does not prevent trial judges from applying well-established rules of evidence to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *Id.* The Constitution permits judges to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice or confusion of the issues. *Id.* "A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." *Id.*

*Bush*, ¶ 59, 193 P.3d at 217–218. This Court recognized in *Bush* that the district court should apply our standard rules of evidence in determining whether alternative suspect evidence is "legal" and, therefore, admissible. *Id.*, ¶ 71, 193 P.3d at 220. Discussing Wyoming law and cases from other jurisdictions on the admissibility of alternative suspect evidence, we stated that the proffered evidence must demonstrate a direct nexus between the alternative suspect and the crime charged. *Id.*, ¶¶ 60–64, 193 P.3d at 218–20. *See also, Grady v. State*, 2008 WY 144, ¶ 13, 197 P.3d 722 (Wyo.2008).

[¶ 38] The district court did not apply a more stringent or different standard to Mr. Smith to gain admission of his alternative suspect evidence than it did to the State for admission of its evidence. The court considered Mr. Smith's proposed alternative suspect evidence in a pre-trial hearing, just like its many other pre-trial rulings, some of which benefited the State and some of which did not. It applied Wyoming's typical rules of evidence, including Rules 401, 402, 403 and 804, in ruling that Mr. Smith's proposed alternative suspect evidence was not admissible. Unlike the cases cited by Mr. Smith, Wyoming courts do not impose an unfair burden upon the defendant to gain introduction of alternative suspect evidence.

[¶ 39] We turn now to the district court's specific rulings on the alternative suspect evidence proposed by Mr. Smith. The district court concluded that the evidence pertaining to Mr. Myers, except "evidence that [he] owned a particular truck and gave [Ms.] Dively rides, [was] inadmissible under WRE 403." [3] Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The district court stated that the probative value of the evidence was small because, at most, it remotely showed an opportunity and potential motive. On the other side of the equation, the district court ruled that the evidence "would present a

---

**3.** The district court further cautioned that it had "not determined that the evidence about ownership or rides is admissible. It only ha[d] determined that such evidence is not inadmissible under WRE 403."

substantial risk of confusion of the issues, misleading the jury and waste of time."

[¶ 40] The district court also indicated that Mr. Smith did not show a direct nexus between Barney Myers and the murder of Ms. Dively. That lack of nexus is apparent in the proffer quoted above. Gary Myers' suggestions that his father was involved in the murder were speculative. He did not provide any specific facts linking his father to the murder. Gary Myers' proposed testimony that Barney had shot at his wife (Gary's mother) and that Barney had made general statements about "getting rid of women" did not link him to the murder at issue here.

[¶ 41] The potentially relevant evidence that Barney Myers owned a truck similar to the one described by Mr. Malone and gave Ms. Dively rides was not rejected by the district court in its ruling. In fact, Barney Myers testified at trial and stated that he knew Ms. Dively, his wife had watched her daughter, she lived across the street from them, and he had owned a 1969 white and blue Chevrolet truck.

[¶ 42] The only other arguably relevant evidence was Gary Myers' statement that his father replaced the tires and had the truck detailed shortly after the murder. The district court ruled that evidence was inadmissible under Rule 403. The court explained that the probative value of the evidence was slight in that Gary Myers' testimony was largely speculative. In contrast, according to the district court, the possible prejudice from the evidence was great. "Such evidence would tempt responsive evidence, and the focus of the trial may move from the guilt or innocence of the Defendant to unrelated matters about ... whether [Barney Myers] really needed or bought new tires."

[¶ 43] We certainly cannot say that the district court abused its discretion when it concluded the probative value of the proposed evidence about the changes to the truck was slight as compared to its prejudicial value. The evidence did not directly

connect Barney Myers' truck to the murder. Although Gary Myers' testimony may have suggested that Barney Myers made the changes to the truck to avoid detection as Ms. Dively's murderer, such a suggestion was pure speculation on this record.

[¶ 44] Turning to Mr. Smith's proposed evidence identifying Mr. Wentz as an alternative suspect, the district court described Mr. Day's statements in its order granting the State's motion to exclude the alternative suspect evidence.[4] We paraphrase the district court's relevant findings as follows:

- On August 24, 1987 Mr. Day met with a detective and requested the State to drop pending charges against him in return for providing evidence about other crimes. At first, he offered evidence about burglaries and drug deals. After the officer told him that information on homicides "was best to obtain a deal with," he stated that he knew about a hit and run where a male was killed. The detective said the only unsolved hit and run involved a woman named Tammy. Mr. Day said that he had information about the death, which he said involved a two wheel drive greenish blue pickup.

- The next day, his story changed. He said that Mr. Wentz had run over "Tammy" with his Chevrolet Blazer after she rejected his sexual advances. He said that Wentz, who was intoxicated at the time, told him that the incident happened, "about a year and a half, two years, three years or something like that" before April, 1986. Later, Mr. Day stated that he did not know when it occurred. He also stated that Mr. Wentz replaced the front bumper and front axles because of damage from "four wheeling." Although they checked Wentz's former residence, investigators did not locate any of the discarded parts.

- In 1998, Mr. Day, then an inmate at the Wyoming State Penitentiary, gave law enforcement more information in hopes of getting favorable treatment. He said

4. It appears that the district court considered some materials that are not included in the record on appeal. Mr. Smith does not, however,

contest the district court's description of the evidence.

Mr. Wentz told him that he had hit a woman with his truck. Mr. Day also claimed that he helped clear a space in the garage for Mr. Wentz's vehicle and that the bumper and grill were covered with blood. According to Mr. Day, Mr. Wentz removed the bumper and replaced a broken headlight. This time, Mr. Day said the hit and run occurred in 1988, 1989, or 1990, and Mr. Wentz had "quite a lot of cash after the incident." Mr. Day also stated that another man, Hans Lobdell, was with Mr. Wentz when he hit the woman. Investigators contacted Mr. Lobdell who, although contradicting Mr. Day's statement in other ways, confirmed seeing a dent on Wentz's white Ford pickup. Mr. Lobdell said that Wentz had told him he had hit a badger, but he thought the dent was too high for a badger.

- In 2007, Mr. Day again talked to investigators and contradicted many of his earlier statements. He stated this time that Mr. Wentz was driving a white Ford pickup, he did not know what he hit and the incident was an accident.

[¶ 45] Mr. Day's testimony relating Mr. Wentz's confession to running over someone was hearsay. Thus, in order to be considered "legal" evidence as required by *Holmes* and *Bush*, it had to fall within a hearsay exception. Wyoming Rule of Evidence 804(b)(3) provides that hearsay statements against interest may be admissible under certain circumstances.

(b) *Hearsay Exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) Statement Against Interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

[¶ 46] In order to be admissible under the hearsay exception, the declarant must be unavailable as a witness, the statement must be self-inculpatory, and there must be corroborating circumstances clearly indicating the trustworthiness of the statement. W.R.E. 804(b)(3). *See also, Brown v. State*, 953 P.2d 1170, 1178 (Wyo.1998); *Johnson v. State*, 930 P.2d 358, 366–68 (Wyo.1996). Mr. Wentz, the declarant, was unavailable as a witness because he was deceased at the time of trial. Moreover, Mr. Wentz's statement that he had hit someone was, obviously, self-inculpatory as a person would not make such a statement unless he believed it to be true. The district court did not, however, believe that the third element—corroborating circumstances clearly indicating the trustworthiness of the statement—had been satisfied.

[¶ 47] The requirement of trustworthiness of a hearsay statement was discussed in *Johnson*. Although our comments in *Johnson* were in the context of another hearsay exception, the principles are relevant for evaluating trustworthiness in the context of the statement against interest exception.

Determining the trustworthiness of a hearsay statement involves

an evaluation of the corroborating facts which further indicate veracity of the statement, the circumstances and conditions under which the statement was made, the incentive which the declarant may have had to be truthful or untruthful, and any factors contributing to the reliability of the report as related by the witness. *United States v. Bailey*, 581 F.2d 341 (3d Cir.1978). Whether a hearsay statement is sufficiently trustworthy is a matter within the sound discretion of the trial court. *State v. Whyde*, 30 Wash.App. 162, 632 P.2d 913 (1981).

*Crozier v. State*, 723 P.2d 42, 48 (Wyo. 1986).

*Johnson*, 930 P.2d at 367–68.

[¶ 48] Discussing the trustworthiness of Mr. Day's statements, the district court ruled:

Smith's proffered evidence ... fails to meet the third requirement of WRE 804(b)(3). This last sentence of WRE 804(b)(3) prevents a defendant from simply stating that some unavailable third party confessed to a crime. Smith cannot introduce Wentz'[s] statement to exculpate himself unless corroborating circumstances "clearly" indicate the trustworthiness of the statement. The Court finds no circumstances which corroborate the trustworthiness of the statement Day claims Wentz made.

Smith suggests that several "facts" provide corroboration for the trustworthiness of Wentz'[s] statement. He claims that Wentz had a lot of money after Dively's death, implying Wentz got the money from Dively. However, most of Day's versions of the Wentz statement indicate that the incident was a hit and run, and that Wentz didn't stop. It hardly is corroboration for Day to claim Wentz had money from an unknown source. Smith argues corroboration is found in the fact that Wentz had an opportunity to know the area where Dively died, and that he had a paper bag that he kept secret. Neither of these facts makes it any more likely that Wentz said what Day claims he did. Day claims he saw blood on Wentz'[s] truck, and that Wentz cleaned it and removed the bumper. All of this "corroboration" comes exclusively from Day, whose credibility is questionable, at best. Day's own version(s) of what happened do not provide corroboration which clearly indicates the trustworthiness of Wentz'[s] statement.

[¶ 49] The district court's decision was thoughtful and well-reasoned. There was no evidence outside of Mr. Day's statement to corroborate Mr. Wentz's declaration. Had there been independent corroborative circumstances, such as another witness's statement about, or actual recovery of, the vehicle, the missing automotive parts, the money or the mysterious paper bag, then the result may have been different. The district court

did not abuse its discretion by refusing to allow Mr. Day to testify about Mr. Wentz's hearsay statement.

[¶ 50] Moreover, the district court properly ruled that the remainder of Mr. Day's testimony was inadmissible under W.R.E. 403. As the district court's recitation of the facts and Mr. Smith's proffer make clear, Mr. Day's several statements were inconsistent in material ways, including the gender of the victim, the year of the incident (varying from years before the murder to 1990), the type of vehicle, and the nature of the incident (intentional as opposed to accidental). The contradicting stories definitely undermine the probative value of Mr. Day's testimony. *See generally, Stephens v. State*, 774 P.2d 60, 72 (Wyo.1989), *overruled on other grounds by Large v. State*, 2008 WY 22, 177 P.3d 807 (Wyo.2008), (stating the probative value of a statement is undermined by a corrupting influence). Moreover, although the evidence may suggest that Mr. Wentz was involved in a hit and run, without Mr. Day's hearsay testimony that Mr. Wentz confessed to killing Ms. Dively, it does not specifically link him to Ms. Dively or this particular incident.

[¶ 51] With regard to the prejudicial value of Mr. Day's testimony, we agree with the district court's assessment: "It is highly probable, almost certain, that issues in the case will become more complicated and confusing, and focus will shift far from the guilt or innocence of Smith, if evidence about Mr. Day and his various statements is admitted." On this record, we certainly cannot say that the district court abused its discretion by excluding Mr. Day's proposed testimony under W.R.E. 403.

### 4. *Habitual Criminal*

[¶ 52] Mr. Smith claims that the application of the habitual criminal statute in this case violated the constitutional protection against *ex post facto* laws.[5] The question of whether a statute is constitutional is

---

5. Mr. Smith also suggests that the application of the habitual criminal statute in his case amounted to cruel and unusual punishment and the statute is unconstitutionally vague. He does not support these aspects of his argument with co-

gent argument or pertinent authority. Thus, we will not consider them. *See, e.g., Adams v. State*, 2005 WY 94, ¶ 10, 117 P.3d 1210, 1215 (Wyo. 2005); *Blakeman v. State*, 2004 WY 139, ¶¶ 25–27, 100 P.3d 1229, 1236 (Wyo.2004).

one of law. *Cathcart v. Meyer*, 2004 WY 49, ¶ 7, 88 P.3d 1050, 1056 (Wyo.2004). Our standard of review is, therefore, *de novo*. We presume statutes to be constitutional and resolve any doubt in favor of constitutionality. *Stanton v. State*, 2006 WY 31, ¶ 13, 130 P.3d 486, 491 (Wyo.2006). "The party challenging the statute bears the burden of proving it is unconstitutional." *Id.* The burden is heavy and the challenger must clearly and exactly show the unconstitutionality beyond any reasonable doubt. *Id.*

[¶ 53] Wyo. Stat. Ann. § 6–10–201 (LexisNexis 2007) requires enhancement of a sentence if the defendant is a habitual criminal:

(a) A person is an habitual criminal if:

(i) He is convicted of a violent felony; and

(ii) He has been convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere.

(b) An habitual criminal shall be punished by imprisonment for:

(i) Not less than ten (10) years nor more than fifty (50) years, if he has two (2) previous convictions;

(ii) Life, if he has three (3) or more previous convictions.

[¶ 54] The jury determined Mr. Smith was a habitual criminal and, because he had been convicted of three other felonies, the district court sentenced him to serve life in prison. He claims that the application of the habitual criminal statute in his case was unconstitutional because the jury was allowed to consider crimes he committed after the instant offense. The evidence admitted during the habitual criminal phase of the trial established that Mr. Smith had been convicted:

- in 1983 for felony burglary committed in Natrona County in September 1982;

- in 1989 for felony first degree sexual assault committed in Natrona County in January 1989; and

- in 2006 for felony aggravated motor vehicle theft committed in Colorado in May 2006.

Obviously, two of the three crimes were committed, and the resulting convictions occurred, after Ms. Dively's murder in 1986.

[¶ 55] Wyo. Const. Art. 1, § 35 and United States Const. Art. 1, § 10 prohibit the passage of *ex post facto* laws. The United States Supreme Court has defined an *ex post facto* law as: " 'any statute ... which makes more burdensome the punishment for a crime, after its commission, ... is prohibited as *ex post facto*.' " *Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925). *See also, In Interest of Jones*, 500 P.2d 690, 692 (Wyo.1972) (stating "[t]he constitutional interdiction of *ex post facto* laws reaches out to every law which deprives the accused of any substantial right or immunity possessed by him at the time when he is said to have committed the offense charged.").

[¶ 56] This Court considered a classic *ex post facto* law in *Loomer v. State*, 768 P.2d 1042 (Wyo.1989). Mr. Loomer was convicted of aggravated robbery and kidnapping for events that took place on March 21, 1987. *Id.* at 1044. The district court included a provision in Mr. Loomer's sentence requiring him to reimburse the county for the costs of his prosecution. *Id.* at 1048–49. The statute which allowed courts to tax costs in a criminal case did not go into effect until May 22, 1987. Because Mr. Loomer committed his crimes prior to the effective date of the statute allowing taxation of the costs of prosecution as punishment for a crime, we held that the assessment of such costs in his case violated the constitutional prohibition against *ex post facto* laws. *Id.*

[¶ 57] Here, the habitual criminal statute, in its present form, was adopted by the legislature in 1983. Mr. Smith committed this crime in 1986. Thus, this case does not present as a classic *ex post facto* case. Instead, Mr. Smith's argument focuses more on the statutory language used in § 6–10–201, which states that a person is a habitual criminal if he has been "convicted of a violent felony" and "convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere." He ar-

gues that "previous charges" means felonies committed before the crime for which he was being tried. Mr. Smith phrases his argument as: "We maintain that 'previous' means previous to the date of the offense and not the conviction and if previous means prior to the date of conviction that such punishment violates the *ex post facto* laws of the United States and the State of Wyoming."

[¶ 58] In *Green v. State*, 784 P.2d 1360, 1365 (Wyo.1989), we stated that "[t]he statute does not require that a crime be previously committed, only that there be [a] previous conviction[ ]." Thus, in *Green* it was appropriate for the jury to consider, in a habitual criminal proceeding, a prior conviction even though the crime from which the conviction arose was committed after the offense on trial. *Id.* Our precedent clearly establishes that, under the language of § 6–10–201, the district court properly allowed consideration of Mr. Smith's prior convictions, despite the fact that two of those offenses were committed after he murdered Ms. Dively.

[¶ 59] In considering Mr. Smith's argument that this interpretation of the statute amounts to creation of an *ex post facto* law, we note that the habitual criminal statute does not create a separate offense, but is simply a sentence enhancement for the offense at issue. Many years ago, the United States Supreme Court explained that habitual criminal statutes provide enhanced penalties for defendants who repeatedly commit crimes. *See Gryger v. Burke*, 334 U.S. 728, 732, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948). This Court offered a similar explanation in *Urbigkit*, 2003 WY 57, ¶ 56, 67 P.3d 1207, 1227 (Wyo.2003):

> The intent behind Wyoming's habitual criminal statute is to provide enhanced punishment to an individual who has engaged in a pattern of violent criminal conduct.... 'A habitual criminal statute does not punish a defendant for his previous offenses but for his persistence in crime, and it has been said that to be a habitual criminal involves a status rather than the commission of a separate offense.' *Evans [v. State ]*, 655 P.2d [1214,] 1220–21 [ (Wyo. 1982) ] (quoting 39 Am.Jur.2d, *Habitual*

*Criminals and Subsequent Offenders*, § 2, pp. 308–310 (1968)).

[¶ 60] Section 6–10–201 does not retroactively increase the punishment for conduct committed before its passage; it also does not retroactively increase the punishment for the previous convictions. Instead, the habitual criminal statute simply enhances the punishment for the offense currently before the court based upon the defendant's criminal record. The fact that the conduct which was prosecuted in the earlier convictions actually occurred after the conduct giving rise to the current offense does not change the operation of the habitual criminal statute to make it unconstitutionally retroactive. Indeed, if we were to decide otherwise, a defendant could avoid habitual criminal classification by effectively evading prosecution for a period of time. That is not the intent or purpose behind the constitutional prohibition against *ex post facto* laws. We conclude, therefore, that the application of the habitual criminal statute in this case was not unconstitutional.

### 5. Change of Venue

[¶ 61] Mr. Smith moved for a change of venue on the first day of trial based upon an article published in the Casper Star Tribune that morning. The article apparently referred to Mr. Smith's prior conviction for sexual assault. The district court had previously ruled in a pre-trial hearing that evidence of the conviction was not admissible, under W.R.E. 404(b), in the guilt phase of the trial. The judge was concerned that the information in the article, if it had been read by the venire, essentially undermined his liminal ruling that the State could not introduce evidence of the prior conviction. The district judge took the defense motion for a change of venue under advisement and the parties proceeded with *voir dire*.

[¶ 62] The judge ordered that each juror who had read or heard of a news account about the case be questioned individually outside the presence of the rest of the jury pool. The jurors were queried about what they recalled from the news account and whether they could remain impartial in light of the

knowledge they had gained. The court ruled:

> Those who read today's story—I am only going to be concerned about the ones who recall or read the portion about his prior conviction; and I am convinced that the ones who said I looked at the story and was unable to recall the prior conviction either didn't recall it or didn't read it. It was in the end of the story; and I am convinced they are okay.
>
> I am going to excuse the three [who commented about the prior conviction].
>
> And I agree with you, [prosecutor], that this doesn't fit the statutory definition of grounds for excusal for cause; but I also believe strongly the court made a limine ruling; and to have them potentially say in the jury room, you know, the guy was convicted once before, voids that ruling in limine; and it really would need to—We would need to let the defense deal with that ahead of time.
>
> This is going to avoid the problem, so I will excuse those three, and we will call someone to replace them, and we will go on from there.

[¶ 63] Although the parties do not direct us to a specific ruling in the record, the district court apparently denied the motion for a change of venue because a jury was seated and the trial proceeded. Mr. Smith claims the district court erred when it failed to grant his motion for a change of venue.

[¶ 64] We review the denial of a motion for change of venue using the abuse of discretion standard. *Urbigkit*, ¶ 26, 67 P.3d at 1220. We will not interfere with the trial court's decision unless the trial court acted in a manner exceeding the bounds of reason under the circumstances. *Nixon v. State*, 994 P.2d 324, 326–27 (Wyo.1999).

[¶ 65] A criminal defendant is entitled "to a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

Wyo. Const. Art. 1, § 10. Similarly, Wyo. Stat. Ann. § 1–7–102(a) states that "[e]very criminal case shall be tried in the county in which the indictment or offense charged is found, except as otherwise provided by law." *See also* W.R.Cr.P. 18.[6] However, there is a procedure for a change of venue when local prejudice prevents a defendant from receiving a fair trial. W.R.Cr.P. 21(a) states:

> (a) *Prejudice Within County.*—Upon timely motion of the defendant, the court shall transfer the proceeding as to that defendant to another county, but only if the court is satisfied that there exists within the county where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial in that county.

[¶ 66] This Court has adopted a two-part test to determine whether a change of venue should be granted on the basis of pre-trial publicity. First, we consider the nature and extent of the publicity. Secondly, we analyze the difficulty or ease encountered by the district court in selecting a jury " 'along with the amount of prejudice which actually appears during *voir dire* examination.' " *Urbigkit*, ¶¶ 26–27, 67 P.3d at 1220, quoting *Sides v. State*, 963 P.2d 227, 231 (Wyo.1998) which quoted *Murry v. State*, 713 P.2d 202, 208 (Wyo.1986). The defendant usually has the responsibility of proving actual prejudice in order to obtain a change of venue. *Id.* at ¶ 26, 67 P.3d at 1220. We will only invoke a presumption of prejudice in extreme cases where the pre-trial publicity is "so inflammatory as practically to dictate the community's opinion." *Carothers v. State*, 2008 WY 58, ¶ 11, 185 P.3d 1, 8–9 (Wyo.2008).

[¶ 67] Applying our two-part test for motions for a change of venue, we first consider the nature and extent of the publicity. In this case, there was apparently only one article in the Casper Star Tribune on the morning of the first day of trial. Thus, the publicity was not extensive. However, the nature of the information in the article, especially

---

6. W.R.Cr.P. 18 states:

Except as otherwise permitted by statute or by these rules, the prosecution shall take place in the county in which the offense is alleged to have been committed, or in the municipality whose ordinance is alleged to have been violated. The court shall fix the place of trial with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

the reference to the excluded prior conviction, was troublesome and could have potentially tainted the jury panel.

[¶ 68] The second part of the test directs us to analyze the relative difficulty or ease encountered by the district court in selecting a jury, taking into account the amount of prejudice which actually appeared during *voir dire* examination. Here, there were several jurors who had read or heard about the article. Those jurors were questioned individually outside the presence of the other jurors. Some expressed concerns and/or prejudices arising from the information they had read. With regard to those who stated that they were aware of the prior conviction, the judge simply dismissed them.

[¶ 69] While the judge was correct in stating that the potential jurors' exposure to the information about Mr. Smith's prior conviction, alone, may not have technically fallen

within the allowable causes for dismissal from the jury panel,[7] he felt that the danger of tainting the jury was so great that dismissal was justified. The potential jurors who were aware of the article but did not specifically refer to the information about the prior conviction were simply questioned about whether they could put aside the information and decide the case based upon the evidence presented at trial.

[¶ 70] The record does not reflect that it took an especially long time to seat a jury. The entire *voir dire* process, including the individual questioning of the jurors who had read the article, took less than half a day. Additionally, the *voir dire* process did not result in excusing a great number of jurors because they were prejudiced by the coverage. Only three jurors were excused because they recalled the information in the article about Mr. Smith's prior conviction.[8]

7. Wyo. Stat. Ann. § 7-11-105 (LexisNexis 2007) states the grounds for dismissal of a potential juror for cause in criminal case:

(a) The following is good cause for challenge to any person called as a juror in a criminal case:

(i) That he was a member of the grand jury which found the indictment;

(ii) That he has formed or expressed an opinion as to the guilt or innocence of the accused, or is biased or prejudiced for or against the accused;

(iii) In a case in which the death penalty may be imposed, he states that his views on capital punishment would prevent or substantially impair performance of his duties as a juror in accordance with his oath or affirmation and the instructions of the court;

(iv) That he is a relation within the fifth degree to the person alleged to be injured, or attempted to be injured, by the offense charged or to the person on whose complaint the prosecution was instituted, or to the defendant;

(v) That he has served on a petit jury which was sworn in the same cause against the same defendant, and which jury either rendered a verdict which was set aside, or was discharged after hearing the evidence;

(vi) That he has served as a juror in a civil case brought against the defendant for the same act;

(vii) That he has been subpoenaed as a witness in the case.

(b) The same challenges for cause shall be allowed in criminal prosecutions that are allowed to parties in civil cases.

Section 7-11-105(b) refers to the challenges for cause in a civil case. Those bases for challenge are set out in Wyo. Stat. Ann. § 1-11-203:

(a) Challenges for cause may be taken on one (1) or more of the following grounds:

(i) A lack of any of the qualifications prescribed by statute which render a person competent as a juror;

(ii) Relationship by consanguinity or affinity within the third degree to either party;

(iii) Standing in the relation of debtor or creditor, guardian or ward, master or servant, or principal or agent to either party, or being a partner united in business with either party, or being security on any bond or obligation for either party;

(iv) Having served as a juror or a witness in a previous trial between the same parties for the same cause of action, or being then a witness therein;

(v) Interest on the part of the juror in the event or question involved in the action, but not an interest of the juror as a member or citizen of a municipal corporation;

(vi) Having formed or expressed an unqualified opinion or belief as to the merits or the main question of the action. The reading of newspaper accounts of the subject matter before the court shall not disqualify the juror either for bias or opinion;

(vii) The existence of a state of mind in the juror evincing enmity or bias for either party.

8. A couple other jurors were excused for reasons which are not completely clear in the record. One juror, who was dismissed during the *voir dire* process because of a previous experience with violent crime, also indicated that he did not believe he could set aside his preconceived opinion which he said was "due to the Casper Star Tribune." (Vol. I, pp. 27–28, 33–36).

There is simply no indication in the record that it was especially difficult to seat a jury or that the jury panel, as a whole, was actually prejudiced by the limited publicity.

[¶ 71] The judge in this case obviously faced an awkward situation when the article placed his earlier liminal ruling in jeopardy. His response to the problem was thoughtful. By dismissing the potential jurors who recalled the information about the prior conviction, the district court arguably afforded Mr. Smith more protection than was required under the relevant statutes. Moreover, the jury was seated without any significant problems and the record does not demonstrate that the jury panel was actually prejudiced by the pretrial publicity. We conclude the judge carefully considered the circumstances and crafted an appropriate response to the publicity thereby minimizing the potential prejudice to the defendant. The trial judge did not abuse its discretion by rejecting Mr. Smith's motion for a change of venue.

### CONCLUSION

[¶ 72] There was sufficient evidence for the jury to find Mr. Smith guilty of second degree murder. The evidence that he was the perpetrator of the crime and committed it purposely and with malice was adequate under our law. Additionally, the prosecutor did not violate Mr. Smith's Fifth Amendment right to remain silent by eliciting testimony and commenting on his refusal to voluntarily provide a sample for DNA testing. The Fifth Amendment protection does not apply to non-testimonial evidence such as a DNA sample and Mr. Smith was not coerced into refusing to give the sample.

[¶ 73] The district court properly applied Wyoming's well-known rules of evidence to exclude Mr. Smith's alternative suspect evidence. The evidence that Mr. Myers potentially killed Ms. Dively was more prejudicial than probative under W.R.E. 403. Mr. Smith's proposed evidence that Mr. Wentz was the killer was properly excluded as hearsay and under Rule 403.

[¶ 74] The application of Wyoming's habitual criminal statute to enhance Mr. Smith's sentence by using two convictions which occurred after he committed the crime in this case did not violate his constitutional protections against *ex post facto* laws. Finally, the district court did not abuse its discretion by denying Mr. Smith's motion for a change of venue. He was unable to demonstrate the jury panel was prejudiced against him to justify a change of venue.

[¶ 75] Affirmed.